**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TIM ANDERSON, MEGAN ANGERS,  )
ELIZIA ARTIS, CHARLIE ATCHLEY,  )
MARINA BASSETT, BRENT COLBERT,  )  Case No. 1:23-cv-02245
KYLE CRAIG, CRYSTAL ESCAMILLA,  )
JONATHAN FREUND, MARGARET GAY,  )  Judge Charles P. Kocoras
CLARE GERVASI, LANDON GEORGE,  )  Magistrate Judge Jeffrey T. Gilbert
OLIVIA LOVE-HATLESTAD, CODY  )
JONES, IAN "RIVER" KERSTETTER,  )
TORI LARSEN, LUIS ALDAIR RAFAEL-  )  JURY DEMAND
NIETES, KATHLEEN ROBERTS,  )
VERONICA RODRIGUEZ, COPELAND  )
SMITH, BRITTANY SOWACKE,  )
JACQUELINE SPREADBURY,  )
CHARLOTTE VAIL, JEANNINE WISE,  )
NATALIE "BYUL" YOON, KORRINA  )
ZARTLER,  )
 )
    Plaintiffs,  )
 )
    v.  )
 )
 )
SUPERINTENDENT DAVID BROWN,  )
CITY OF CHICAGO, and CHICAGO  )
POLICE OFFICERS IN EXHIBITS A–G,  )
 )
    Defendants.  )
 )

**<u>AMENDED COMPLAINT</u>**

  1.  During the summer of 2020, the United States was in the throes of the largest

social justice movement in history.  In a repudiation of anti-Black racism, white supremacy,

police violence, and mass criminalization and incarceration, millions joined demonstrations

around the globe—often lifting up the names of George Floyd, Breonna Taylor, Tony McDade,

Jacob Blake, and too many other Black people killed by police.

2.      Plaintiffs, as well as thousands of other organizers, activists, and community leaders in Chicago—multi-racial and intergenerational in composition—engaged in a wide range of actions throughout the summer of 2020, including rallies, marches, and other creative protests that consistently opposed racist police violence and demanded substantial changes, including the massive reduction of taxpayer money being used to fund the Chicago Police Department ("CPD").

3.      The CPD and other City agencies responded to these demonstrations with brutal, violent, and unconstitutional tactics that are clearly intended to injure, silence, and intimidate Plaintiffs and other protesters.  These abuse tactics include beating protesters with batons—often striking them in the head; tackling and beating protesters while on the ground; using chemical agents against protesters; falsely arresting protesters; and trapping protesters in enclosed areas.

4.      CPD consistently targeted protest leaders, marshals, legal observers, medics, and individuals recording the demonstrations with unlawful, retaliatory, and lethal force.

5.      CPD also targeted protesters' property—destroying cameras, phones, and eyeglasses; and confiscating bikes, backpacks, and other belongings.

6.      CPD officers' animus against Plaintiffs and other protesters is unmistakable— they regularly called protesters vile and vulgar names, often using misogynistic and homophobic words.  Officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes, and other inappropriate behavior at these protests.

7.      CPD's response to the summer 2020 protests is consistent with the CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change.

8.    These systemic and ongoing violations continued to occur despite the City of Chicago being subject to a Consent Decree for almost two years.  CPD's documented failure to comply with the Consent Decree deadlines coupled with its consistently illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in the CPD.

9.    CPD's unconstitutional policies and practices against protesters has caused Plaintiffs significant harm, including the violation of their constitutional rights as well as physical, emotional, and mental injuries.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

12.    Plaintiff Tim Anderson[1] is a 37-year-old white resident of Chicago, Illinois who uses he/him pronouns. Plaintiff Anderson attended a protest in Grant Park on July 17, 2020.

13.    Plaintiff Megan Angers is a 25-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Angers attended a protest in downtown Chicago on May 30, 2020.

---

[1]  Plaintiffs' ages listed here are their ages at the time the original complaint was filed on November 19, 2020.

14.     Plaintiff Elizia Artis is a 30-year-old Black resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Artis attended a protest in downtown Chicago with her husband, Plaintiff Kyle Craig, on May 30, 2020.

15.     Plaintiff Charlie Atchley is a 25-year-old white resident of Chicago, Illinois who uses they/them pronouns. Plaintiff Atchley attended a protest in downtown Chicago on August 15, 2020.

16.     Plaintiff Marina Bassett is a 26-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Bassett attended a protest in downtown Chicago on May 30, 2020.

17.     Plaintiff Brent Colbert is a 31-year-old white resident of Chicago, Illinois who uses he/him pronouns. Plaintiff Colbert attended a protest in downtown Chicago with his partner Plaintiff Jonathan Freund on May 30, 2020.

18.     Plaintiff Kyle Craig is a 31-year-old white resident of Chicago, Illinois who uses he/him pronouns. Plaintiff Craig attended a protest in downtown Chicago with his wife Plaintiff Elizia Artis, on May 30, 2020.

19.     Plaintiff Crystal Escamilla is a 25-year-old Latinx resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Escamilla attended a protest in downtown Chicago on May 30, 2020.

20.     Plaintiff Jonathan Freund is a 28-year-old white resident of Chicago, Illinois who uses he/him pronouns. Plaintiff Freund attended a protest in downtown Chicago with his partner Plaintiff Brent Colbert on May 30, 2020.

21.     Plaintiff Margaret Gay is a 29-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Gay attended a protest in downtown Chicago on May 30, 2020.

22.     Plaintiff Clare Gervasi is a 38-year-old white resident of Chicago, Illinois who uses they/them pronouns. Plaintiff Gervasi attended a protest in Grant Park on July 17, 2020.

23.     Plaintiff Landon George is a 24-year-old white resident of Rippin, Wisconsin who uses he/him pronouns. Plaintiff George attended a protest in Grant Park on July 17, 2020.

24.     Plaintiff Olivia Love-Hatlestad is a 22-year-old white resident of Chicago, Illinois who uses she/they pronouns. Plaintiff Love-Hatlestad attended a protest in downtown Chicago on May 30, 2020, and in Uptown on June 1, 2020.

25.     Plaintiff Cody Jones is a 29-year-old white resident of Chicago, Illinois who uses they/them pronouns. Plaintiff Jones attended a protest in downtown Chicago on May 30, 2020.

26.     Plaintiff Ian "River" Kerstetter is a 28-year-old Native American resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Kerstetter attended a protest in Grant Park on July 17, 2020.

27.     Plaintiff Tori Larsen is a 27-year-old white resident of Chicago, Illinois who uses she/they pronouns. Plaintiff Larsen attended a protest in Grant Park on July 17, 2020.

28.     Plaintiff Luis Aldair Rafael-Nietes is a 25-year-old Latinx resident of Chicago, Illinois who uses he/him pronouns. Plaintiff Rafael-Nietes attended a protest in Grant Park on July 17, 2020.

29.     Plaintiff Kathleen Roberts is a 31-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Roberts attended a protest in Grant Park on July 17, 2020.

30.     Plaintiff Veronica Rodriguez is a 20-year-old Latinx resident of Chicago, Illinois who uses she/they pronouns. Plaintiff Rodriguez attended a protest in downtown Chicago on May 30, 2020.

31.     Plaintiff Copeland Smith is a 23-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Smith attended a protest in Old Town on June 1, 2020.

32.     Plaintiff Brittany Sowacke is a 30-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Sowacke attended a protest in downtown Chicago on May 30, 2020.

33.     Plaintiff Jacqueline Spreadbury is a 31-year-old white resident of Chicago, Illinois who uses she/they pronouns. Plaintiff Spreadbury attended a protest in downtown Chicago on May 30, 2020 and May 31, 2020 as a legal observer.

34.     Plaintiff Charlotte Vail is a 24-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Vail attended a protest in downtown Chicago on May 30, 2020, in Uptown on June 1, 2020, and in Grant Park on July 17, 2020.

35.     Plaintiff Jeannine Wise is a 45-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Wise attended a protest in downtown Chicago on May 30, 2020.

36.     Plaintiff Natalie "Byul" Yoon is a 28-year-old Asian resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Yoon attended a protest in Grant Park on July 17, 2020.

37.     Plaintiff Korrina Zartler is a 28-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Zartler attended a protest in downtown Chicago on May 30, 2020.

38.     Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.  It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is

ultimately responsible.  Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

39.     Defendant David Brown is the Superintendent of the Chicago Police Department. At all times relevant to the events at issue in this case, Defendant Brown was employed by the CPD.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Brown promulgated rules, regulations, policies, and procedures of the CPD. Defendant Brown is responsible for supervising all CPD officers and managing all operations at the CPD.  He is sued here in his individual capacity.

40.     Defendants Officers in Exhibits A–G are City of Chicago employees with the CPD. These officers—and additional unknown officers who violated Plaintiffs' constitutional rights—are to date unidentified. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD.  They are sued as agents and employees of the City of Chicago and in their individual capacities for violating Plaintiffs' rights guaranteed by the U.S. Constitution and Illinois state law.

## FACTUAL ALLEGATIONS

### I.     The CPD's Violent and Unconstitutional Response to Protesters Throughout the Summer of 2020

41.     On May 25, 2020, Minneapolis police officers murdered George Floyd when they suffocated him to death while he was handcuffed in a prone position on the ground in broad daylight on the street.  Floyd begged to breathe, for his mother, and for his life, and witnesses begged the officers to let him go, before he ultimately took his last breath.

42.     Floyd's murder and the police murder of Breonna Taylor in her home in Louisville, Kentucky, in addition to recent police murders of too many additional Black people

throughout the United States, sparked the largest social justice movement in the history of the United States and has included protests around the world against anti-Black police violence, white supremacy, systemic racism, and inequality.

43.     After May 29, 2020, there were numerous protests and actions throughout the City of Chicago—ranging in size from a few dozen people to thousands.  These protests occurred all throughout Chicago, including in the Loop and on the South, West, and North sides, and have been attended by people of all ages, races, and demographics.  In particular, protests occurred on May 29–31, June 1, July 17, and August 15, 2020.

44.     The CPD responded to these protests with brutal, violent, and unconstitutional tactics that were clearly intended to injure and silence protesters who were protesting their violence and the violence of other state actors.

45.     CPD officers consistently targeted protesters who were peacefully exercising their First Amendment rights with unlawful, retaliatory, and lethal force.

46.     Protesters often reported that CPD officers intentionally struck them on their head with batons with enough force to leave people bloodied and in some instances with serious concussions.



47.     On June 23, 2020, the Chicago Reader published an in-depth examination of the

CPD's use of lethal force, including baton strikes to the head, during the May 2020 protests

(excluding protests in June, July, and August).  The reporter documented:

> 83 baton strikes on at least 32 different people by officers, most captured on video.
> Nearly all appear to violate [CPD] policy, with more than half of the strikes on video
> involving police beating people who were already on the ground.  Multiple videos also
> show officers hitting protesters in the head with batons despite rules limiting these strikes
> to situations requiring deadly force.[2]

48.     The Chicago Reader article notes that these unlawful uses of force often occurred

in full view of supervisors who failed to intervene and that most officers failed to report their

uses of force.

49.     The CPD's brutal response to these protests and protesters also included police

officers:

    a.   driving CPD cars through crowds of protestors;

    b.   punching protesters in the face;

    c.   tackling protesters to the ground;

---

[2]  Andrew Fan and Dana Brozost-Keller, Cops Appear to violate use-of-force rules dozens of times at protests, Chicago Reader (June 23, 2020), https://www.chicagoreader.com/chicago/police-baton-use-of-force-protests/Content?oid=80849109.

     d.  kneeing protesters in the neck and back;

     e.  kicking protesters in the legs to cause them to fall;

     f.  jabbing batons into protesters' bodies;

     g.  trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces on bridges and other locations;

     h.  using tear gas and pepper spray;

     i.  dragging protesters through the streets;

     j.  stomping on protesters on the ground; and

     k.  beating protesters severely with batons.

These acts of violence were wholly unwarranted and there was no objectively reasonable basis to use such dangerous and violent force.

     50.    CPD officers also targeted those the CPD has identified as protest marshals, legal observers, medics, or leaders with the most brutal violence apparently as part of a strategy to quell the protesters' free expression.

     51.    CPD officers also used violence on protesters who expressed concern or were protesting that CPD officers were harming other people at the protests.

     52.    CPD officers also targeted those who were filming, or otherwise documenting police violence at the protests, by pushing, shoving, brutalizing, and harassing them in the midst of the protests.  Often this resulted in confiscated or damaged cameras and recording equipment and physical injury to protesters exercising their First Amendment right to record the police.

     53.    CPD officers who violated protesters' constitutional rights also routinely took steps to conceal their identities—and thereby avoid accountability for their misconduct—by, *inter alia*, covering and/or removing their name plates and badges, refusing to provide their names and badge numbers when asked, obstructing protesters who attempted to view their name plates and badges, and failing to complete paperwork to document their conduct.

54.     CPD officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes and other inappropriate behavior at these protests.  CPD officers used particularly hostile language towards women and members of the LGBTQ community.

55.     CPD officers' animus against protesters is unmistakable—they regularly referred to protesters with terms that are vile, misogynistic, and anti-gay, including officers calling protesters "pussy," "cunt," "bitch," and "faggots," and repeatedly use the word "fuck" when issuing commands.  One officer threatened protesters by yelling "you fucking bitch," and "wait till I get my badge off, you fucking faggot."[3]

56.     CPD's response to the protests also reflects a pattern and practice of breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, backpacks, and, in some instances, canes used to assist with mobility.

57.     CPD has also engaged in a systemic practice of illegal searches of protesters, seizure of protesters, and false arrest of protesters.

58.     Throughout the protests, the CPD has also engaged in racially motivated arrests of protesters, even though the protests were attended by multi-racial crowds of people, the majority of whom were white.  According to CPD records, during the initial weekend of protests (May 29 – 31) CPD arrested 2,172 people.  According to the Chicago Reader, the vast majority of those arrested, over 70 percent, were Black Chicagoans; however, only 32 percent of the City of Chicago identify as Black people.[4]

---

[3] John Wright, Chicago Officer Who Called Protester a 'F-king Faggot' Likely to Be Stripped of Police Powers: WATCH, Towleroad (June 11, 2020), https://www.towleroad.com/2020/06/chicago-officer-who-called-protester-a-f-king-faggot-likely-to-be-stripped-of-powers-watch/.

[4] Kiran Misra, Most of the people arrested at the protests were Black, Chicago Reader (June 30, 2020), https://www.chicagoreader.com/chicago/protest-arrests-racial-disparity/Content?oid=81018291.

59.     Despite widespread evidence of unchecked police violence, throughout these events, former Mayor Lori Lightfoot praised the police for their "restraint."

60.     As of February 2021, protesters filed 591 protest-related complaints against CPD officers.  58% of those complaints alleged excessive force and 9% alleged verbal abuse. The number of protest complaints is so large, the Civilian Office of Police Accountability ("COPA") formed a specialized team of investigators solely dedicated to investigating these allegations.[5] As a result of COPA's preliminary investigations into the protest complaints, it referred 5 officers to state/federal law enforcement for potential criminal prosecution and has recommended that 8 officers be assigned to modified duty and/or be relieved of police power.  No other officers involved in protest-related abuses have been disciplined thus far.

61.     During a City Council budget hearing, COPA's Chief Administrator, Sydney Roberts, informed City lawmakers that "several themes were prevalent" throughout the protest complaints including "excessive use of batons," "excessive verbal abuse" and the failure of officers to comply with CPD's body camera policy as well as policies requiring Chicago police officers to display their names and badge numbers.[6] Chief Roberts also noted that these themes were so "consistent across multiple investigations" that she sent a memo to CPD leadership urging it to "take immediate action to address the deficiencies."[7]  Upon information and belief, Defendant Superintendent Brown received Chief Robert's memo during the Summer 2020 uprisings and failed to take any action to redress the documented deficiencies.

---

[5]  Fran Spielman, CPA chief says recurring themes dominate complaints against CPD during civil unrest, Chicago Sun-times (Nov. 10, 2020), https://chicago.suntimes.com/2020/11/10/21559391/chicago-police-reform-copa-chief-recurring-themes-dominate-complaints-against-cpd-civil-unrest.

[6]  https://www.chicagocopa.org/data-cases/protest-related-information/

[7]  Id.

62.     Pursuant to the relevant Chicago code provisions, Defendant Superintendent Brown is "responsible for the general management and control of the Police Department" and has "full and complete authority to administer the Department."[8]  Defendant Superintendent Brown made all command decisions about the Chicago Police Department's systematic response to protesters during the 2020 uprisings.  Defendant Superintendent Brown, through actions both explicit and implicit, authorized and directed the unlawful conduct described throughout this complaint.  He encouraged and permitted Chicago police officers to target, attack, and harass protesters with violent animus and took no action to halt Chicago police officer's systemic violence against protesters for Black lives.  Further, Defendant Superintendent Brown was physically present for at least one protest where he described standing "shoulder to shoulder" with Chicago police officers.  During the protest(s) Defendant Superintendent Brown attended personally, he failed to intervene to stop officer violence and misconduct.

63.     In an apparent effort to justify and/or conceal his officers' brutal violence and unlawful conduct, Defendant Superintendent Brown made a number of false and misleading statements to the media about the Summer 2020 uprisings and the actions of Chicago police officers.  For example, in reference to the August 15, 2020 downtown protest Defendant Superintendent Brown stated that he and his officers "trailed along" the protesters until the protesters became "confrontational" and began assaulting officers.  Defendant Superintendent Brown asserted that his officers did not engage in the practice of kettling (i.e., detaining a mass of people without justification and failing to provide people opportunities to leave).  After an investigation, a media outlet labeled these assertions as "false" and found evidence of kettling and video depicting Chicago police officers chasing demonstrators and witnesses who described

---

[8]  Chicago Municipal Code § 2-84-040

Chicago police officers attacking protesters who did not immediately disperse.[9]  The same outlet also declared that Defendant Superintendent Brown publicly expressed a number of misleading and unsubstantiated negative statements about protesters including that they carry mace and were "agitators [who] hijacked a peaceful protest."[10]

64.     On October 13, 2020, Defendant Superintendent Brown acknowledged serious ongoing and systemic deficiencies within the CPD during his address to new CPD recruits. Defendant Superintendent Brown informed the recruits that "this civil unrest is about you."  He informed them that they would be working alongside officers who "never should have been hired" and "who have lost their way" and that, despite the existence of these officers, the new recruits must "discern" right from wrong.  During the same address, Defendant Superintendent Brown also acknowledged that "good cops don't tell on the bad cops" and that CPD has a culture of "protecting each other" and that it is difficult for officers to "hold each other accountable."[11]

## II.     Protesters' Rights Were Violated at Protests Throughout the City

### A.     May 29–31, 2020 Demonstrations Downtown

65.     In the wake of the police murders of George Floyd, Breonna Taylor, and other Black people, there were massive demonstrations against anti-Black police violence in downtown Chicago and the River North area over the weekend of May 29–31, 2020.

---

[9]  Jim Daley and Jason Schumer, Fact-Checking Police Supt. David Brown on August 15, South Side Weekly (Sept. 2, 2020), https://southsideweekly.com/fact-checking-david-brown-august-15/.

[10]  Id.

[11]  'This Civil Unrest Is About You': Police Superintendent David Brown Gives Passionate Speech to New Recruits, NBC Chicago (Oct. 13, 2020), https://www.nbcchicago.com/top-videos-home/this-civil-unrest-is-about-you-police-superintendent-david-brown-gives-passionate-speech-to-new-recruits/2353284/.









Chicago police officers clash with protesters Saturday near Kinzie and State streets as thousands in Chicago joined national outrage over the death of George Floyd, who died in police custody on Memorial Day in Minneapolis. | Ashlee Rezin Garcia / Sun-Times

### i. May 30, 2020 Baton Attacks of Megan Angers (Trump Tower)

66.     On the afternoon of May 30, 2020, Plaintiff Megan Angers attended a demonstration near the steps of Trump Tower, protesting against racist police violence and in solidarity with the Black Lives Matter movement.

67.     Behind Plaintiff Angers were hundreds of other protestors. At some point, Chicago police officers told people to move. Plaintiff Angers and many others had their hands up, telling the Chicago police officers that they could not move because there was nowhere to go.

68.     Despite having nowhere to go, one or more unidentified Chicago police officers used batons to repeatedly push and shove Plaintiff Angers and other protesters. An unidentified Chicago police officer also struck Plaintiff Angers on her leg with his baton, without justification.

69.     Plaintiff Angers did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

70.     Plaintiff Angers did not commit any unlawful act and was engaging in constitutionally protected activity.

71.     At the time the officers used excessive force against Plaintiff Angers, the officers knew that Plaintiff Angers was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Angers.

72.     As a direct and proximate result of the actions by the Defendant Officers' actions as detailed above, Plaintiff Angers suffered and continues to suffer, *inter alia,* bodily injuries including bruises to her leg and arms, as well as pain and suffering, extreme mental distress, anguish, and fear.

### ii. May 30, 2020 Baton Attacks of Plaintiffs Elizia Artis and Kyle Craig (State and Kinzie)

73.     On May 30, 2020, Plaintiffs Elizia Artis and Kyle Craig, who are married, arrived at Federal Plaza in downtown Chicago around 2:00 p.m. to participate in a protest against racist police violence and in solidarity with the Black Lives Matter movement.

74.     Plaintiffs Artis and Craig marched around downtown, then to Trump Tower, and then proceeded to Lake Shore Drive, where they watched protesters give speeches and recite poetry. Plaintiffs Artis and Craig then continued marching and ended up at State Street and Kinzie Street around 5:30 p.m.

75.     Plaintiffs Artis and Craig were standing on the corner in front of the Public House restaurant when they observed two Chicago police officers for no valid reason start to beat a protester with batons. Plaintiff Artis yelled to stop beating the protester, but the officers ignored her pleas and continued beating the protestor. Three officers then charged at them with their batons out.

76.     A young woman was knocked over by protesters running away from the charging officers and fell to the ground.

77.     Plaintiff Artis tried to cover the young woman on the ground with her body so that others would not run over the young woman. While doing so, an unidentified Chicago police officer started hitting Plaintiff Artis in the back repeatedly with his baton without justification.

78.     The Chicago police officer then stopped hitting Plaintiff Artis and yelled, "get the fuck out of here." Plaintiff Artis tried to help the young woman up and the officer yelled at her again. Plaintiff Artis put her hands in the air and told the officer that she would go wherever he wanted her to go. In response the officer told her, "you just need to get the fuck out of here."

79.     Plaintiff Craig also tried to help the young woman get up. While doing so, an unidentified Chicago police officer started pushing Plaintiff Craig back with his baton, which he

was holding horizontally with hands on each end, without justification. The officer pushed Plaintiff Craig back with his baton all the way around the corner and then knocked Plaintiff Craig to the ground. The fall knocked off Plaintiff Craig's glasses and also broke his camera.

80.     After picking up his glasses, Plaintiff Craig tried to walk back to find his wife. Plaintiff Craig told the Chicago police officer that his wife was over there and asked to please be allowed to go find her. The officer then hit Plaintiff Craig in the face with his baton, holding it horizontally with two hands, without justification. The officer then said, "I don't give a shit, you shouldn't have come here fucker," and hit Plaintiff Craig again in the face with his baton, knocking him to the ground.

81.     Other protesters helped Plaintiff Craig up and he walked a different way to find his wife.

82.     Plaintiffs Artis and Craig did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

83.     Plaintiffs Artis and Craig did not commit any unlawful act and were engaging in constitutionally protected activity.

84.     At the time the officers used excessive force against Plaintiffs, the officers knew that Plaintiffs were participating in a public demonstration, as well as calling out police brutality and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiffs.

85.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Artis suffered and continues to suffer, *inter alia,* bodily injuries, including pain and soreness in her back, as well as pain and suffering, extreme mental distress, anguish and fear.

86. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Craig suffered and continues to suffer, *inter alia,* bodily injuries, including bruises on his arm and pain in his face, as well as pain and suffering, extreme mental distress, anguish, fear, and property damage.

### iii. May 30, 2020 Baton Attack of Plaintiff Marina Bassett (Trump Tower)

87. In the afternoon on May 30, 2020, Plaintiff Basset joined a demonstration in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

88. Plaintiff Bassett and other protesters marched to Trump Tower where they stopped outside the west entrance on Wabash Avenue.

89. Plaintiff Bassett observed Chicago police officers clad in uniforms with riot gear standing on the stairs of Trump Tower.

90. Protesters remained in this location chanting, among other things, "Who Do You Serve, Who Do You Protect;" "We are here for Black lives, we are here for Black futures;" "We need allyship;" "No Justice, No Peace, No Racist Police;" and "Black Lives Matter."

91. Chicago police officers began to push the crowd with their batons, knocking a young female protester to the ground.

92. As Plaintiff Bassett leaned down to try to help this woman off the ground, an unidentified Chicago police officer, without justification, hit her in the head with his baton, causing her severe pain and injury.

93. Upon information and belief, this Defendant Officer depicted below in Exhibit B, who had removed his badge from his uniform, continued to strike Plaintiff Bassett with his baton in her ribs, causing her pain and injury.



**Exhibit B**

94.     Plaintiff Bassett then retreated to the back of the crowd, away from the Chicago police officers.

95.     At this location, Plaintiff Bassett continued to observe Chicago police officers and noted some of the officers had tape covering their badge numbers on their badges.



96.     Plaintiff Bassett grew tired and started to feel pain from being repeatedly struck by a baton and returned home.

97.     Later that evening, Plaintiff Bassett's friends observed that she was unable to focus and she was growing incoherent.

98.     A friend of Plaintiff Bassett brought her to the emergency room at Swedish Covenant Hospital where she was treated by medical professionals.

99.     Medical treaters diagnosed that Plaintiff Bassett sustained a concussion, a bruised and swollen eye, and bruises on her side.

100.    Since the protest on May 30, 2020, Plaintiff Bassett continues to suffer injury from the unidentified Chicago police officer's excessive force, including intermittent ringing in her ears.

101.    Plaintiff Bassett did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

102.    Plaintiff Bassett did not commit any unlawful act and was engaging in constitutionally protected activity.

103.    At the time the officers used excessive force against Plaintiff Bassett, the officers knew that Plaintiff Bassett was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Bassett.

104.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Bassett suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

     **iv.**    **May 30, 2020 Baton Attack of Crystal Escamilla (Michigan Avenue)**

105.    In the afternoon of May 30, 2020, Plaintiff Crystal Escamilla assembled with thousands in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

106.    Plaintiff Escamilla joined the demonstration at the Harold Washington Library and followed the crowd of protestors throughout the downtown area.

107.    As the demonstration was heading to Trump Tower, Plaintiff Escamilla along with scores of others were blocked from proceeding south by several Chicago police officers when they were north of the Michigan Avenue bridge over the Chicago River.

108.    As Plaintiff Escamilla and others were just north of the Michigan Avenue bridge, Chicago police officers with bicycles aggressively came through the crowd, pushing and hitting people with their bicycles.

109.    Plaintiff Escamilla also observed Chicago police officers clad in uniforms and riot gear push protestors with their batons, many of whom they were pushing to the ground.

110.    Chicago police officers, without justification, began to swing and strike protesters with batons on their body, causing Plaintiff Escamilla to lose her balance and almost fall to the ground.

111.    One or more unidentified Chicago police officers then struck Plaintiff Escamilla on various parts of her body, including her neck and bicep, with a baton for no justifiable reason.

112.    Plaintiff Escamilla did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

113.    Plaintiff Escamilla did not commit any unlawful act and was engaging in constitutionally protected activity.

114.     At the time the officers used excessive force against Plaintiff Escamilla, the officers knew that Plaintiff Escamilla was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Escamilla.

115.     Plaintiff Escamilla suffered physical injuries and pain as a result of the Defendant Officers' unnecessary and excessive use of force, causing her visible injuries.

116.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Escamilla suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### v.     May 30, 2020 Beating of Plaintiff Brent Colbert and Attack of Plaintiff Jonathan Freund (Trump Tower)

117.     On May 30, 2020, at approximately 2:30 p.m., Plaintiffs Brent Colbert and Jonathon Freund, who are a couple, rode together on their bikes to join a protest in downtown Chicago against racist police violence and in support of the Black Lives Matter movement.

118.     After joining a demonstration at Federal Plaza, Plaintiffs Colbert and Freund marched with other protesters until they ended up in front of Trump Tower.

119.     When they arrived in front of Trump Tower, Chicago police officers began to box protesters in by aggressively pushing them back with their shields.

120.     One or more unidentified Chicago police officers then begin hitting protesters with their batons, including Plaintiff Colbert.

121.     An unidentified Chicago police officer pushed Plaintiff Freund on his left arm with a heavy force without justification, causing Plaintiff Freund pain and a bruising on his left arm.

122.     As Chicago police officers were hitting and pushing Plaintiffs Colbert and Freund and other protesters back, officers did not tell protesters where to move or give them an opportunity to go in a different direction. Officers effectively pushed the protesters into a crowd so tight that then protesters had nowhere to go.

123.     Plaintiff Colbert put his hands up to indicate he posed no threat to the officers.

124.     Around this same time, an unidentified Chicago Police officer hit Plaintiff Freund in his head and face with a shield, without justification, knocking Plaintiff Freund's glasses to the ground.

125.     Plaintiff Freund was unable to retrieve his glasses as the crowd trampled and broke them.

126.     An unidentified Chicago police officer with #1862716[12] on his helmet told Plaintiff Colbert, "If you didn't want to get hurt you shouldn't come to protest."

127.     The unidentified Chicago police officer then jabbed his baton into Plaintiff Colbert's right rib twice, causing him to hunch over in serious pain, which also prevented him from being able to move temporarily.

128.     Plaintiff Freund and Plaintiff Colbert managed to leave the protest together.

129.     Plaintiff Colbert sought emergency medical treatment for the pain and injuries he sustained to his ribs, which were visibly bruised for a significant period of time and required he receive prescription medication for the pain.

130.     The force to Plaintiff Freund's left arm resulted in bruising that remained for several weeks.

---

[12] This was the number on the officer's helmet, but it is unclear if this was a valid badge number or this officer's badge number.

131.    Plaintiffs Colbert and Freund did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

132.    Plaintiffs Colbert and Freund did not commit any unlawful act and were engaging in constitutionally protected activity.

133.    At the time the officers used excessive force against Plaintiffs, the officers knew that Plaintiffs were participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiffs.

134.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiffs Colbert and Freund suffered and continues to suffer, *inter alia,* bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

###    vi.    May 30, 2020 Abuse of Plaintiff Margaret Gay (Trump Tower; Grand and Dearborn)

135.    On May 30, 2020, Plaintiff Gay arrived at the protest downtown around 2:00 p.m. to protest against racist police violence and in solidarity with the Black Lives Matter movement.

136.    Plaintiff Gay marched with protesters to Trump Tower. Around 5:30 p.m., Plaintiff Gay made her way to the front line of protesters on the north side of Wabash Bridge towards Trump Tower. While standing in the front line, one or more unidentified Chicago police officers shoved their batons and shields into her ribs and her body, without justification, and pushed her backwards.

137.    Plaintiff Gay observed a Chicago police officer, for no observavble reason, grab a Black teenager, pull him forward and then Plaintiff Gay, was shoved and elbowed by Chicago police officers.

138.    Chicago police officers continued to push and shove Plaintiff Gay and protesters on the north side of the bridge backward, but there was nowhere for them to go as protesters and

officers on the south side of the bridge were not moving. As a result, Plaintiff Gay and others were being crushed on the bridge and could not move.

139.     By around 7:30 p.m., Chicago police officers had pushed Plaintiff Gay and the protesters completely off Wabash bridge.

140.     Plaintiff Gay walked to Grand and Dearborn around 8:30 p.m. or later. There, she observed a group of Chicago police officers circling a young man who appeared beaten up and unconscious.

141.     She then observed an unidentified Chicago police officer pull out his gun and start pointing it at the group of people observing the officers surrounding the young man. At this point, many of the protesters started to run away from the officer pointing the gun, and in fear for her life, Plaintiff Gay moved out of the way to avoid the officer's line of fire.

142.     Plaintiff Gay did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

143.     Plaintiff Gay did not commit any unlawful act and was engaging in constitutionally protected activity.

144.     At the time the officers used excessive force against Plaintiff Gay, the officers knew that Plaintiff Gay was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Gay.

145.     As a direct and proximate result of the actions of Defendant Officers as detailed above, Plaintiff Gay suffered and continues to suffer, *inter alia,* bodily injuries, including bruises on her ribs, arms, elbows, knees, and legs, as well as pain and suffering, extreme mental distress, anguish, and fear.

      **vii.     May 30, 2020 Attacke of Cody Jones (State and Wacker; Grand and Dearborn)**

146.     On May 30, 2020, Plaintiff Cody Jones joined a protest downtown to protest against racist police violence and in support of the Black Lives Matter movement.

147.     Plaintiff Jones walked to State and Wacker around 7:00 p.m.

148.     There, Plaintiff Jones observed an unidentified Chicago police officer dressed in riot gear pepper spray an elderly man—who appeared to be around 70 years old—who was riding a bike. As Plaintiff Jones approached the elderly man, the unidentified officer turned around and pepper sprayed Plaintiff Jones and several other protesters without justification. Plaintiff Jones stumbled back and experienced temporary blindness and eye irritation; they were tended to by a medic.

149.     Plaintiff Jones was trapped downtown because all the bridges were raised. When the LaSalle bridge was eventually lowered, Plaintiff Jones crossed the bridge around 8:30 p.m. and made their way to Grand and Dearborn.

150.     Plaintiff Jones witnessed a young man being chased by Chicago police officers., Plaintiff Jones observed officers tackle the young man, beat him, and drag him behind a line of officers.

151.     While Plaintiff Jones was standing with a group of protesters watching the Chicago police officers beat the young man, an unidentified Chicago police officer pulled out his gun, unlocked the safety, put his finger on the trigger, and charged at Plaintiff Jones and the group of protesters while pointing his gun at them. Plaintiff Jones ran from this officer and other officers that joined in the chase in fear for their life causing them to injure their knee..

152.     Plaintiff Jones did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

153.    Plaintiff Jones did not commit any unlawful act and was engaging in constitutionally protected activity.

154.    At the time the officers used excessive force against Plaintiff Jones, the officers knew that Plaintiff Jones was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Jones.

155.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Jones suffered and continues to suffer, *inter alia,* bodily injuries, including eye irritation and knee pain, as well as pain and suffering, extreme mental distress, anguish, and fear.

### viii.    May 30, 2020 Baton Attacks of Plaintiff Olivia Love-Hatlestad (Near Federal Plaza)

156.    On May 30, 2020, Plaintiff Olivia Love-Hatlestad traveled to Federal Plaza in downtown Chicago to participate in a protest against racist police violence and in support of the Black Lives Matter movement.

157.    Plaintiff Love-Hatlestad arrived at Federal Plaza at approximately 1:00 p.m. prior to the start of the demonstration to be trained as a marshal for the demonstration in order to keep the protesters marching together while encouraging social distancing.

158.    The protesters marched from Federal Plaza through the streets of downtown Chicago, and at approximately 3:30 p.m., the protesters were moving north on Dearborn Street a couple of blocks from Federal Plaza.

159.    Plaintiff Love-Hatlestad observed Chicago police officers in full riot gear become increasingly aggressive toward a line of protesters.

160.    Plaintiff Love-Hatlestad turned her attention to an individual being singled out and brutally arrested.

161.     As Plaintiff Love-Hatlestad witnessed this arrest and brutality, an unidentified Chicago police officer, without justification, wielded a baton in one hand, cocked at a 45-degree angle, and brought it rapidly downward, striking her arm with a forceful blow, causing a painful bruise to her upper arm.

162.     Plaintiff Love-Hatlestad was eventually able to make her way back to her car parked near Federal Plaza, and with great difficulty due to police barricades and street closures, was finally able to leave the downtown area.

163.     Plaintiff Love-Hatlestad did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

164.     Plaintiff Love-Hatlestad did not commit any unlawful act and was engaging in constitutionally protected activity.

165.     At the time the officers used excessive force against Plaintiff Love-Hatlestad, the officers knew that Plaintiff Love-Hatlestad was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Love-Hatlestad.

166.     As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Love-Hatlestad suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### ix.     May 30, 2020 Baton Attack of Plaintiff Veronica Rodriguez (Michigan Avenue)

167.     In the afternoon of May 30, 2020, Plaintiff Verónica Rodriguez assembled with thousands in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

168.     Plaintiff Rodriguez joined the demonstration at the Harold Washington Library and followed the crowd of protesters throughout the downtown area.

169.     As the demonstration was heading to Trump Tower, Plaintiff Rodriguez along with scores of others were blocked by several Chicago police officers from proceeding south when they were north of the Michigan Avenue bridge over the Chicago River.

170.     As Plaintiff Rodriguez and others were just north of the Michigan Avenue bridge, Chicago police officers with bicycles aggressively came through the crowd, pushing and hitting people with their bicycles.

171.     Another set of Chicago police officers began walking through the crowd of protesters and began pushing people down on the ground and encircling two young Black men.

172.     Plaintiff Rodriguez fell to the ground and while they were on the ground, an unidentified Chicago police officer, without justification, swung his baton at Plaintiff Rodriguez, hitting them on the left side of their head, causing them tremendous pain and serious injury.

173.     Individuals in the crowd then grabbed Plaintiff Rodriguez, picked them up, and walked them to an ambulance.

174.     Plaintiff Rodriguez was severely injured after being hit in the head with a baton, which caused them to sustain a gaping, bleeding cut in their head requiring emergency medical treatment, including receiving several staples in her head to close the wound. They also sustained other visible injuries.



175.     Plaintiff Rodriguez did not physically attack, assault, threaten or resist the Defendant Officer or any other Chicago police officer at any time or in any way.

176.     Plaintiff Rodriguez did not commit any unlawful act and was engaging in constitutionally protected activity.

177.     At the time the officers used excessive force against Plaintiff Rodriguez, the officers knew that Plaintiff Rodriguez was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Rodriguez.

178.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Rodriguez suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

>     **x.     May 30, 2020 Beating and False Arrest of Brittany Sowacke (Trump Tower)**

179.     On May 30, 2020, at approximately 2:30 p.m., Plaintiff Brittany Sowacke joined a large demonstration at Federal Plaza in downtown Chicago to protest the police killings of George Floyd, Breonna Taylor, and other instances of anti-Black racism in the United States.

180.     Shortly after 6:00 p.m., Plaintiff Sowacke was with a group of protesters on the Wabash Avenue bridge near Trump Tower.

181.     Chicago police officers wearing riot gear were preventing protesters from marching further north on Wabash Avenue.

182.     Plaintiff Sowacke was toward the front of the crowd, with a large number of protesters behind her. There were additional Chicago police officers behind the group of protesters, to the south, boxing the crowd.

183.     The Chicago police officers, holding their batons horizontally in front of their bodies, began to forcefully push their batons into the bodies of the protesters. One or more unidentified Chicago police officers used their batons without justification to push Plaintiff Sowacke about her body, including her throat, arms, and shoulders.

184.     Plaintiff Sowacke was wearing a backpack in front of her body, which contained her camera and photography gear.

185.     An unidentified Chicago police officer said, "Get this bitch!" in reference to Plaintiff Sowacke and one or more unidentified Chicago police officers grabbed a hold of her.

186.     An unidentified Chicago police officer pulled open Plaintiff Sowacke's backpack, pulled out her professional grade camera, and tossed it to the pavement. This same officer then pulled out an additional camera lens out of the bag and threw it to the pavement.

187.    Multiple unidentified Chicago police officers then grabbed Plaintiff Sowacke and pulled her from the crowd. These unidentified officers grabbed Plaintiff Sowacke with such force that they left bruises on her arms.

188.    Plaintiff Sowacke was then arrested by unidentified Chicago police officers for no justifiable reason. She was handcuffed with plastic zip-ties and taken into police custody.

189.    Plaintiff Sowacke was placed on a bus with other arrested protesters and taken to the Chicago police lockup at the intersection of Belmont and Western. She was released without charges the following morning, spending over 14 hours in police custody.

190.    Plaintiff Sowacke did not physically attack, assault, threaten, or resist any of the Defendant Officers or any other police officer at any time or in any way.

191.    Plaintiff Sowacke did not commit any unlawful act and was engaging in constitutionally protected activity.

192.    At the time the officers used excessive force against Plaintiff Sowacke, the officers knew that Plaintiff Sowacke was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Sowacke.

193.    As a result of the Defendant Officers' use of force, Plaintiff Sowacke had bruises on her arms and shoulders, which lasted over a week.

194.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Sowacke suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, loss of property, extreme mental distress, anguish, and fear.

><b>xi.    May 30, 2020 Baton Attacks (Trump Tower) and May 31, 2020 Abuse (Van Buren and Wabash; Clark and Hubbard) of Plaintiff Jacqueline Spreadbury</b>

195.    On May 30, 2020, Plaintiff Spreadbury arrived at Federal Plaza around 1:00 p.m. on her bike, having volunteered as a legal observer, dressed in a bright green shirt and bright green hat identifying her as a legal observer.

196.    The march started from Federal Plaza around 2:00 p.m. and Plaintiff Spreadbury began to bike around and observe. Plaintiff Spreadbury and another legal observer with whom she was paired rode to the Wabash Avenue bridge, making their way to the north side of the bridge on the sidewalk around 4:40 p.m.

197.    At the north side of the bridge, Plaintiff Spreadbury observed a line of Chicago police officers facing a line of protesters. The officers began to hit the protesters indiscriminately with their batons.

198.    Plaintiff Spreadbury then made her way to the front line of the protesters, leaving her bicycle on the sidewalk with the other legal observer. She attempted to collect people's names who were being beaten and arrested, but whenever she would ask for a name, Chicago police officers would swing their batons and scream so that she could not hear the names.

199.    Chicago police in riot gear cleared off the sidewalks and lined the sidewalks with police so that protesters were surrounded by police and crammed together.

200.    Plaintiff Spreadbury was trapped on the bridge for over an hour observing protesters get beaten and arrested by Chicago police without any observable reason.

201.    Plaintiff Spreadbury identified herself a number of times as a legal observer who was trying to get the names of people who were arrested. Plaintiff Spreadbury was hit by one or more unidentified Chicago police officers with batons multiple times when she tried to ask for the names of protesters who were being beaten and arrested. Plaintiff Spreadbury was also repeatedly shoved back by one or more unidentified Chicago police officers who held their

batons horizontally with two hands. As a result, Plaintiff fell on the ground two times and was helped up by protesters.

202.    The Chicago police officers who shoved and hit Plaintiff Spreadbury were not wearing name badges.

203.    Plaintiff Spreadbury tried to get off the bridge by asking Chicago police officers several times if they could exit onto the sidewalk, but they were told "no" each time they asked. Plaintiff eventually was able to weave their way through protesters and off the bridge on the south end.

204.    On May 31, 2020, Plaintiff Spreadbury arrived at the Thompson Center around 2:00 p.m. to be a legal observer for a protest scheduled to begin at 3:00 p.m. As such, she was wearing a bright green hat.

205.    Plaintiff Spreadbury followed protesters south to CPD headquarters, and then back downtown.

206.    When the protesters reached Van Buren and Wabash Avenue around 7:00 p.m., the Chicago police without warning started to get aggressive with the protesters, many of whom were teenagers, and started shoving the protesters with bikes.

207.    Plaintiff Spreadbury then observed a group of teenagers head down Wabash Avenue and she followed them. When the teenagers and Plaintiff Spreadbury got to Wabash Avenue and Adams Street, they stopped and stood around on the sidewalk to wait for the rest of the march.

208.    As they were standing on the sidewalk, at around 7:45 p.m., two unidentified Chicago police officers, wearing full SWAT gear, jumped out of an armored SWAT vehicle. Without warning, the officers started pepper spraying the teenagers. Plaintiff observed the

officers run up to the teenagers, and the officer holding the pepper spray gun sprayed the teenagers in the face while the other officer stood by.

209.    The two Chicago police officers then ran up to Plaintiff Spreadbury and pepper sprayed them in the face and on the left arm. The pepper spray caused Plaintiff Spreadbury's eyes to burn and she began coughing.

210.    After the officers pepper sprayed about five people, including Plaintiff Spreadbury, they jumped back in their vehicle.

211.    Eventually Plaintiff Spreadbury began following protesters again and made her way to Clark Street and Hubbard Street. At Clark and Hubbard, around 8:10 p.m., she observed Chicago police officers grab two teenagers who appeared to be 18 or 19 years old, without any observable reason and form a barricade with their bikes around the teenagers. More Chicago police officers joined the barricade and expanded it, trapping two legal observers in the barricade.

212.    When more officers joined the barricade, the Chicago police officers began to beat and strike both of the teenagers who they grabbed and trapped inside the barricade.

213.    As the Chicago police officers continued to beat and strike the teenagers, Plaintiff Spreadbury attempted to ask the officers for their names. An unidentified Chicago police officer told her to "shut up," and she pointed to her hat and told him that she was a legal observer and asked for his name again. In response, the officer shoved Plaintiff Spreadbury to the ground and threw his bike on top of her. This officer did not have a name badge.

214.    Plaintiff Spreadbury did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

215.   Plaintiff Spreadbury did not commit any unlawful act and was engaging in constitutionally protected activity.

216.   As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Spreadbury suffered and continues to suffer, *inter alia,* bodily injuries, including bruises all over her body, a large cut on her left arm, as well as pain and suffering, extreme mental distress, anguish, and fear.

**xii.   May 30, 2020 Baton Attacks of Plaintiff Charlotte Vail (Downtown)**

217.   On May 30, 2020, Plaintiff participated in a protest in downtown Chicago against racist police violence and in support of the Black Live Matter movement. She was identified as a marshal during the demonstration, wearing a bright orange shirt, responsible for helping guide protesters on where to march..

218.   The protesters started marching from Federal Plaza through the streets of downtown around 2:00 p.m. However, because police in riot gear blocked their paths, the protestors were unable to proceed on their desired route.

219.   Plaintiff Vail observed Chicago police officers in riot gear become increasingly aggressive toward protesters.

220.   At one point, Plaintiff Vail observed Chicago police officers grab two protesters from the crowd. Plaintiff Vail went to see if one of the young men who was grabbed was okay, but before she could reach the young man, an unidentified Chicago police officer pushed her with a baton and then one or more unidentified Chicago police officers shoved her hard to the ground.

221.   Plaintiff Vail did not physically attack, assault, threaten or resist the Defendant Officers or any other police officer at any time or in any way.

222.     Plaintiff Vail did not commit any unlawful act and was engaging in constitutionally protected activity.

223.     At the time the officers used excessive force against Plaintiff Vail, the officers knew that Plaintiff Vail was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Vail.

224.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Vail suffered and continues to suffer, *inter alia,* bodily injuries, including bruises to her arms and shoulders, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xiii.     May 30, 2020 Abuse and False Arrest of Jeannine Wise (Trump Tower)

225.     On May 30, 2020, at around 2:30 p.m., Plaintiff Jeannine Wise joined a protest at Federal Plaza in downtown Chicago against racist police violence and in support of the Black Lives Matter movement.

226.     At around 4:00 p.m., Plaintiff Wise arrived at the Wabash Avenue bridge near Trump Tower. Plaintiff Wise was in the front line of protesters on the north side of the bridge where she observed a line of Chicago police officers and another horse-mounted line of police officers behind them.

227.     Without warning or justification, an unidentified Chicago police officer began pushing his baton horizontally into Plaintiff Wise's chest and ribcage, causing her pain.

228.     Plaintiff Wise asked the officer to stop, but he ignored her pleas and kept repeatedly shoving her with his baton in her chest. When Plaintiff Wise put her hands up to protect her chest, the officer shoved his baton into her fingers.

229.     After Plaintiff Wise again pleaded with the officer to stop pushing her, the officer looked her in the eye, then looked at a Black protester standing right next to Plaintiff Wise, and began violently shoving the Black protester with his baton.

230.     When Plaintiff Wise asked the officer to stop pushing the Black protester, another unidentified Chicago police officer said to Plaintiff Wise, "You want to be in it. Now you're in it," and grabbed her by the neck and lifted her into the air so aggressively that her hat and shoe flew off. The officer then dragged Plaintiff Wise down the street by her neck and hooded sweatshirt through horse manure, also causing her back to scrape and bleed.

231.     One or more unidentified Chicago police officers then put Plaintiff Wise in zip-ties, and she waited on the curb near Trump Tower for approximately three hours before being placed on a bus and transported to the police station at Belmont and Western.

232.     After arriving at the police station, Plaintiff Wise sat on the bus another approximately three hours. She told an officer on the bus that she needed to use the bathroom, but was denied access to any facilities.

233.     Plaintiff Wise was finally taken into a police station and remained there until she was released the following morning around 8:00 a.m. Plaintiff was not charged with any offense. She was denied food, water or the use of a mask throughout her time inside the police station.

234.     Plaintiff Wise did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

235.     Plaintiff Wise did not commit any unlawful act and was engaging in constitutionally protected activity.

236.    At the time the officers used excessive force against Plaintiff Wise, the officers knew that Plaintiff Wise was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Wise.

237.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Wise suffered and continues to suffer, *inter alia,* bodily injuries, including bruises, scratches, and scars, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xiv.    May 30, 2020 Baton Attacks of Korrina Zartler (Trump Tower)

238.    On May 30, 2020, Plaintiff Zartler arrived at Federal Plaza around 2:00 p.m. to participate in a protest against racist police violence and in support of the Black Lives Matter movement.

239.    Plaintiff Zartler marched across the Wabash Avenue bridge and to the front of Trump Tower around 3:00 p.m. Plaintiff Zartler observed Chicago police officers in riot gear all over the steps of Trump Tower and in the street.

240.    Plaintiff Zartler was at the front line of the protesters sitting down when Chicago police officers started to get aggressive. She had to stand up quickly because the officers started moving toward the protesters and pushing them with their batons. An unidentified Chicago police officer, without justification, pushed Plaintiff Zartler with his baton in her stomach.

241.    An unidentified Chicago police officer wearing "thin blue line" gloves pointed to Plaintiff Zartler and said, "she has everyone linking arms, it's hard to move them." One or more unidentified Chicago police officers then began pushing Plaintiff Zartler and others in the back with their batons.

242.    Plaintiff Zartler observed Chicago police officers grab people by their backpacks and rip them out of the line. She also observed Chicago police officers beat protesters for no apparent reason.

243.    Plaintiff Zartler was repeatedly pushed by one or more unidentified Chicago police officers with their batons in her back. The officers continued to push Plaintiff Zartler and the protesters further and further back onto Wabash Avenue bridge.

244.    Once Plaintiff Zartler was on the bridge, she could not move anywhere. Chicago police officers were yelling to move back but there was nowhere to go.

245.    Plaintiff Zartler was trapped on the bridge until around 6:30 p.m.

246.    Plaintiff Zartler did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

247.    Plaintiff Zartler did not commit any unlawful act and was engaging in constitutionally protected activity.

248.    At the time the officers used excessive force against Plaintiff Zartler, the officers knew that Plaintiff Zartler was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Zartler.

249.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Zartler suffered and continues to suffer, *inter alia,* bodily injuries, including soreness in her back, as well as pain and suffering, extreme mental distress, anguish, and fear.

**B. May 31, 2020 Demonstration in Hyde Park**

250.    On May 31, 2020, several hundred individuals attended a protest in Hyde Park on Chicago's Southside.  During this action, Chicago police officers targeted Black organizers and activists with violent and often lethal force.  Chicago police officers used particularly violent and

retaliatory force against prominent Black leaders who attempted to help other protesters navigate a protest dispersal.

### C. June 1, 2020 Demonstrations in Uptown and Old Town

251.    On June 1, 2020, several hundred people attended a demonstration in the Uptown neighborhood in Chicago that began in the late afternoon. After a series of speeches, the demonstration began to march on City streets, including on Lake Shore Drive. As the demonstration continued on throughout the evening, the numbers of protesters began to dwindle. As the numbers diminished, many protesters headed toward the Wilson stop of the CTA located at Wilson and Broadway. At or near Wilson and Broadway, Chicago police officers without warnings advanced on protesters and attacked them with batons.

252.    During the afternoon of June 1, 2020, scores of high school students and others participated in a demonstration against anti-Black police violence in support of Black lives at around Division and Larrabee in Old Town, Chicago. Chicago police officers, armed with shields and batons, and some with the use of bicycles, walled off the streets and eventually encircled the protesters. Without issuing any orders to disperse, Chicago police officers then began using their bicycles, shields, or batons to push protesters back while yelling at them to move, even though the protesters had nowhere to go because they were hemmed in by Chicago police officers on all sides.

### i.    June 1, 2020 Baton Attacks of Plaintiff Olivia Love-Hatlestad (Uptown)

253.    On June 1, 2020, Plaintiff Love-Hatlestad responded to a social media post to meet others in the Uptown area of Chicago to demonstrate in support of the Black Lives Matter movement and against racist police violence.

254.     At around 6:00 p.m. Plaintiff Love-Hatlestad arrived at the meeting spot near the Target store on Broadway between Wilson and Montrose Avenues.

255.     Plaintiff participated in the demonstration and march and eventually by about 8:30 p.m. returned back to the area of North Broadway and Wilson Avenue.

256.     At approximately 9:00 p.m., numerous Chicago police officers began aggressively advancing toward the protesters including Plaintiff Love-Hatlestad without giving any warning or dispersal order.

257.     Plaintiff Love-Hatlestad, who was using a cane for assistance in walking, witnessed numerous Chicago police officers push, hit, and beat predominantly Black protesters, including a man she believed to be about 65 years of age.

258.     Plaintiff Love-Hatlestad pleaded with the officers, reminding them that they were armed with guns and the protesters were unarmed.

259.     As Plaintiff Love-Hatlestad observed Chicago police officers chasing and brutalizing a man, they were grabbed and wrestled to the ground by one or more unidentified Chicago police officers. They felt a foot on their shoulder and knee pushing them into the ground and a Chicago police officer, who wore no facial covering or mask, began yelling in their face.

260.     Plaintiff Love-Hatlestad managed to get up off the ground, only to again be viciously pushed by an unidentified Chicago police officer with enough force to knock her again to the ground.

261.     Plaintiff Love-Hatlestad was then surrounded by a semicircle of Chicago police officers, and as an unidentified Chicago police officer struck her with a baton from behind, causing her scalp to bleed and smashing her glasses, an officer facing her told her "that's what you get."

44

262. Once they were able to regain her footing again, Plaintiff Love-Hatlestad was thrown to the ground a third time.

263. Plaintiff Love-Hatlestad was able to eventually locate her partner and they made their way to a friend's house where they realized that their injuries required medical attention. They were assisted in traveling to the Emergency Room at Illinois Masonic Hospital.

264. Plaintiff Love-Hatlestad was treated for their injuries, given a CT scan and X-rays and diagnosed with having suffered a concussion.

265. Plaintiff Love-Hatlestad did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

266. Plaintiff Love-Hatlestad did not commit any unlawful act and was engaging in constitutionally protected activity.

267. At the time the officers used excessive force against Plaintiff Love-Hatlestad, the officers knew that Plaintiff Love-Hatlestad was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Love-Hatlestad.

268. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Love-Hatlestad suffered and continues to suffer, *inter alia,* concussive symptoms and effects, recurrence of symptoms of previously diagnosed Post Traumatic Stress Disorder (PTSD), pain and suffering, extreme mental distress, anguish, and fear.

### ii. June 1, 2020 Baton Attacks of Plaintiff Charlotte Vail (Uptown)

269. On June 1, 2020, at around 8:30 p.m., Plaintiff Vail joined her friends who were marching on Lake Shore Drive in a protest in support of the Black Lives Matter movement and against racist police violence.

270.    Plaintiff Vail and her friends then began walking back toward Broadway and Wilson Avenue. When they reached the Wilson red line train station, Plaintiff Vail observed protesters standing on the corners surrounded by a large number of Chicago police officers in riot gear.

271.    At around 9:00 p.m., a line of officers started charging toward the protesters without giving any warning or dispersal order.

272.    Plaintiff Vail observed a Latinx man being pushed with batons by a group of Chicago police officers, so she went to help him.

273.    Plaintiff Vail then observed Chicago police officers knock down an elderly Black man, who she estimated to be about 60 years old, and start beating him with batons and stomping on him. She ran over to the elderly man and squatted over him to protect him. As she squatted over him, one or more unidentified Chicago police officers hit her on the back multiple times with their batons, without justification.

274.    Plaintiff Vail also saw another Black man on the ground being beat by a number of Chicago police officers with batons.

275.    Chicago police officers were screaming at her telling her to leave but there was nowhere for her to go because officers blocked off all sides of the street.

276.    She eventually found her friend Plaintiff Love-Hatlestad after Plaintiff Love-Hatlestad had been hit in the head with a baton. While searching for another friend, an unidentified Chicago police officer shoved her to the ground with a baton.

277.    Plaintiff Vail did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

278.    Plaintiff Vail did not commit any unlawful act and was engaging in constitutionally protected activity.

279.    At the time the officers used excessive force against Plaintiff Vail, the officers knew that Plaintiff Vail was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Vail.

280.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Vail suffered and continues to suffer, *inter alia,* bodily injuries, including bruises to her back, arms, and leg, as well as pain and suffering, extreme mental distress, anguish, and fear.

### iii.    June 1, 2020 Beating of Plaintiff Copeland Smith (Old Town)

281.    On the afternoon of June 1, 2020, Plaintiff Copeland Smith was at a demonstration in the Old Town neighborhood to protest in solidarity with the Black Lives Matter movement and against racist police violence.

282.    At Division Street and Larrabee Street, dozens of Chicago police officers walled off the streets, planting a row of officers on bicycles in a line in front of several rows of officers on foot, some clad in full riot gear.

283.    Plaintiff Smith and dozens of protesters were virtually encircled by Chicago police officers.

284.    With no warning, the bicycle officers began pushing the protesters, and immediately made way for police officers armed with batons, who then also pushed the protesters and used their batons to push and strike the protesters.

285. Chicago police officers pushed Plaintiff Smith multiple times until they knocked her to the ground, where she curled up in the fetal position trying to protect herself. Rows of unidentified Chicago police officers trampled her.



286. The Defendant Officer depicted below in Exhibit C initiated the continued attack of Plaintiff Smith.



**Exhibit C**

287. Two unidentified Chicago police officers pulled her up by her hair to make her stand up, shoved her, and separated her from her fellow protesters.



288.     Plaintiff Smith did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

289.     Plaintiff Smith did not commit any unlawful act and was engaging in constitutionally protected activity.

290.     At the time the officers used excessive force against Plaintiff Smith, the officers knew that Plaintiff Smith was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Smith.

291.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Smith suffered and continues to suffer, *inter alia,* bodily injuries including bruises to her face, eye, arm, hands, legs, and back, as well as pain and suffering, extreme mental distress, anguish, and fear.

   **D.  July 17, 2020 Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park**

292.     On July 17, 2020, hundreds of protesters participated in a demonstration to demonstrate solidarity for Indigenous people's struggles against colonization, genocide, and to oppose the prominent tribute to Christopher Columbus, embodied by the statue of him in Grant Park, Chicago.

293.     The demonstration started at Buckingham Fountain with a series of speeches and prayer, and later progressed into a march that headed south on Columbus Drive to Grant Park.

294. At Grant Park, protesters marched into the park and gathered near the statue of Columbus, which was heavily guarded by Chicago police officers.



295. Police officers descended into the park swinging their batons and hitting people's heads and bodies, indiscriminately using pepper spray or tear gas on the entire crowd of demonstrators, without justification, causing many people to experience trouble breathing, and engaging in other forms of violence.



296. In addition to the excessive force, Chicago police officers forcibly took over 70

bicycles away from individual protesters and refused to return them that evening.[13]



### i. July 17, 2020 Attack of Plaintiff Tim Anderson (Grant Park)

297. On July 17, 2020, at approximately 5:30 p.m., Plaintiff Tim Anderson arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

298. After listening to speeches and watching Indigenous prayer ceremonies, Plaintiff Anderson began marching with his bicycle to the Columbus statue in Grant Park at approximately 6:50 p.m.

299. At approximately 7:30 p.m., Plaintiff Anderson arrived at the grassy hill between the statue and Roosevelt Road and was observing protesters gathering at the statue.

---

[13] Monica Eng, What Happened to the 76 Bikes Chicago Police Took After Friday's Clash with Protesters?, WBEZ (July 21, 2020), https://www.wbez.org/stories/what-happened-to-the-76-bikes-chicago-police-took-after-fridays-clash-with-protesters/ae29fb14-3189-4044-9896-c1d416b5c515.

300.     Several minutes later, Plaintiff Anderson observed Chicago police officers storm down the hill towards the statue, pepper spraying or tear gassing protesters and beating protesters with batons.

301.     Plaintiff Anderson did not hear any formal warnings or orders to disperse when an unidentified Chicago police officer approached him and yelled at him to "move," the unidentified Defendant Officer then shoved Plaintiff Anderson with both hands, with such force that he was knocked off his feet, flew backwards and landed on his back.

302.     The same officer then grabbed Plaintiff Anderson's bike and threw it into the road, causing damage to this property.

303.     Plaintiff Anderson gathered his bike and was able to repair it before leaving the area at approximately 8:15 p.m.

304.     Plaintiff Anderson did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

305.     Plaintiff Anderson did not commit any unlawful act and was engaging in constitutionally protected activity.

306.     At the time the officers used excessive force against Plaintiff Anderson, the officers knew that Plaintiff Anderson was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Anderson.

307.     As a direct and proximate result of the actions by the Defendant Officer detailed above, Plaintiff Anderson suffered and continues to suffer, *inter alia,* bodily injuries, including bruises and abrasions to his legs and arms, as well as pain and suffering, extreme mental distress, anguish, and fear.

### ii. July 17, 2020 Abuse of Plaintiff Clare Gervasi (Grant Park)

308.    On July 17, 2020, Plaintiff Gervasi volunteered to be a bike marshal during the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park. Plaintiff Gervasi arrived at Buckingham Fountain around 4:00 p.m. to meet with all the marshals prior to the start of the demonstration.

309.    After the rally ended, protesters marched toward the Columbus statue. Plaintiff Gervasi biked in front of the crowd to help keep people safe as they marched through intersections.

310.    Plaintiff Gervasi then stopped biking near the Columbus statue and helped to direct people out of the street and into the park, later joining a line of bicycles in front of the Columbus statute.

311.    While standing in line, more Chicago police officers arrived in riot gear and formed their own line facing the line Plaintiff Gervasi was standing in 10–15 feet away.

312.    Without provocation or warning, the Chicago police officers charged the line of protesters. An unidentified Chicago police officer unjustifiably used his arms to push Plaintiff Gervasi into the bikes and people behind them. Plaintiff Gervasi's leg was cut and bruised as a result of being pushed.

313.    Then the unidentified Chicago police officer grabbed Plaintiff Gervasi's bike and threw it behind him. Plaintiff Gervasi's bike flew approximately 15 feet and smashed into a tree. The front of Plaintiff Gervasi's bike and its brakes were damaged from being thrown, rendering it inoperable.

314.    After attending to their bike, Plaintiff Gervasi later moved with 10–15 other protesters to form another linenear the retaining wall parallel to Roosevelt Road.

315.     Plaintiff Gervasi stood in line while Chicago police officers stood in front of them for approximately 20 minutes.

316.     At approximately 7:30 p.m., Chicago police officers began to advance on the line of protesters.

317.     Plaintiff Gervasi observed an unidentified Chicago police officer beat the man standing next to them with his baton on the head, shoulder, and ribs.

318.     The unidentified Chicago police officer then tried to take the man's bike, and Plaintiff Gervasi took hold of the back of the bike to prevent it from being thrown. As Plaintiff Gervasi was holding the back of the bike, without warning, the unidentified Chicago police officer unjustifiably used his baton to strike Plaintiff Gervasi's right hand, causing them to let go of the bike. Once Plaintiff Gervasi let go of the bike, the unidentified Chicago police officer then used his baton to hit Plaintiff Gervasi in the stomach.

319.     As Plaintiff Gervasi's hand began to swell, they became concerned it was broken, and they left the protest to tend to their injuries.

320.     On Sunday, July 19, 2020, Plaintiff Gervasi went to an urgent care in Edgewater to receive medical attention for the injury sustained to their hand, which was bruised and severely swollen.

321.     Plaintiff Gervasi had X-rays taken and was told that the bone in their right thumb was chipped and that some of their tendons were also damaged. Plaintiff Gervasi was given a brace for their hand and told to refrain from moving it to help it heal.

322.     Plaintiff Gervasi still has pain in their thumb and has not regained a full range of motion.

323. Plaintiff Gervasi did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

324. Plaintiff Gervasi did not commit any unlawful act and was engaging in constitutionally protected activity.

325. At the time the officers used excessive force against Plaintiff Gervasi, the officers knew that Plaintiff Gervasi was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Gervasi.

326. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Gervasi suffered and continues to suffer, *inter alia,* bodily injury to their right thumb, scrapes and bruising on their leg, bruising on their stomach, as well as pain and suffering, extreme mental distress, anguish, fear, and damage to their property.

### iii.   July 17, 2020 Baton Attacks of Plaintiff Landon George (Grant Park)

327. On July 17, 2020, Plaintiff George traveled to Chicago to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

328. Plaintiff George had volunteered to be a marshal during the protest and so he arrived at Buckingham Fountain around 4:00 p.m. to meet with all the marshals prior to the start of the demonstration. Plaintiff George wore a yellow tie around his arms to signal that he was a marshal.

329. When the protesters started marching to the Columbus statue, Plaintiff George stayed in the back and on the perimeters.

330. When he arrived at the statue, Plaintiff George observed a wall of Chicago police with bikes surrounding the statue. Plaintiff George observed Chicago police become aggressive when protesters started to approach the statue.

331.     Plaintiff George observed Chicago police advance towards the protesters, pushing and shoving them with their batons and with bikes.

332.     When Plaintiff George observed a Chicago police officer dragging a protester by his hair,  an unidentified Chicago police officer appeared in front of him and grabbed Plaintiff George by his neck, squeezed his neck, and tried to throw him down. The officer pushed Plaintiff George forward as he was choking him for a few seconds, and then eventually let go.

333.     While standing in the front line of protestors with his hands up, an unidentified Chicago police officer, holding his baton horizontally with both hands, and without justification, began repeatedly shoving and hitting Plaintiff George in his chest with the baton.

334.     After many shoves to his chest, the officer grabbed Plaintiff George's shirt and then swung his baton without justification, hitting Plaintiff George in his head at least two times. The first strike hit Plaintiff George above his right eyebrow, causing him to immediately start bleeding, and the second strike hit him on the left side of his face, cutting his lip.

335.     Plaintiff George was bleeding profusely and could not see out of his right eye. Someone pulled him out of the crowd and walked him back to the steps of the statue, where a medic helped clean and bandage his wound.

336.     Plaintiff George sustained a two-inch gash on his head.



337.    After receiving this treatment, Plaintiff George walked back to Buckingham Fountain, where another medic checked his pupil dilation for a concussion. The medic informed Plaintiff George that he might have a concussion and recommended that he go to the hospital.

338.    Plaintiff George met up with a friend who drove him to a hospital in Wisconsin, where doctors tended to his wound and took a CT scan.

339.    Plaintiff George did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

340.    Plaintiff George did not commit any unlawful act and was engaging in constitutionally protected activity.

341.    At the time the officers used excessive force against Plaintiff George, the officers knew that Plaintiff George was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff George.

342.    As a direct and proximate result of Defendant Officers' actions as detailed above, Plaintiff George suffered and continues to suffer, *inter alia,* bodily injuries, including a cut above

his right eyebrow, a cut on the inside of his lip, a concussion, and bruises on his chest and legs, as well as pain and suffering, extreme mental distress, anguish, and fear.

### iv. July 17, 2020 Baton Attacks of Plaintiff Ian "River" Kerstetter (Grant Park)

343.    On July 17, 2020, Plaintiff Kerstetter arrived at Buckingham Fountain around 5:00 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

344.    After listening to speakers and watching ceremonies, Plaintiff Kerstetter and her friend marched toward the Columbus statue.

345.    When Plaintiff Kerstetter arrived near the statute, Chicago police officers began advancing from every angle and, at around 7:00 p.m. or 7:30 p.m., Plaintiff Kerstetter observed Chicago police officers use tear gas or pepper spray on protesters near her.

346.    Chicago police officers yelled at protesters to "move" and then immediately started to push the line of protesters without providing any opportunity or direction to the protestors.

347.    Without justification, an unidentified Chicago police officer violently pushed Plaintiff Kerstetter—either with his baton or with his hands—causing her feet to come out from under her and her body to roll down a hill.



348.    While Plaintiff Kerstetter remained on the ground, lying on her stomach with her back exposed, another unidentified Chicago police officer hit her with his baton at least two times, striking her on the back and on her right side, without justification.

349.    She was aided to her feet and as she tried to leave the area with a friend, who is white, Plaintiff's friend was allowed through the police line but a female Chicago police officer refused to let Plaintiff pass through to leave.

350.    While Plaintiff Kerstetter was waiting for the officers to let her through so that she could go home, she observed a young person get gassed or sprayed in the eyes, and Plaintiff helped that person by giving them water.

351.    Eventually Plaintiff Kerstetter was able to walk through the line of Chicago police and leave the park around 8:00 p.m.

352.    The pain in Plaintiff Kerstetter's right side continued for days and did not subside, forcing her to see a doctor on July 27, 2020, who told her most likely she suffered a bruised rib.

353.    Plaintiff Kerstetter did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

354.     Plaintiff Kerstetter did not commit any unlawful act and was engaging in constitutionally protected activity.

355.     At the time the officers used excessive force against Plaintiff Kerstetter, the officers knew that Plaintiff Kerstetter was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Kerstetter.

356.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Kerstetter suffered and continues to suffer, *inter alia,* bodily injuries, including a bruised rib, a large bruise on her back, and cuts on the back of her knee, as well as pain and suffering, extreme mental distress, anguish, and fear.

### v.     July 17, 2020 Abuse of Plaintiff Tori Larsen (Grant Park)

357.     On July 17, 2020, at around 5:30 p.m., Plaintiff Larsen arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park. Plaintiff Larsen attended the rally with her friend.

358.     After the rally ended, Plaintiff Larsen marched with other protesters south toward the Columbus statue. As they approached the statue, they observed the Chicago police surrounding it.

359.     Plaintiff Larsen joined a line of protesters that were facing a line of Chicago police officers. Both the protesters and the police had bikes in their respective lines.

360.     Plaintiff Larsen observed several Chicago police officers arbitrarily, and quickly, advance to snatch protesters' bikes and then use the bikes to push the protesters down to the ground.

361.    Plaintiff Larsen and another protester were pushed by one or more unidentified Chicago police officers, with such force causing Plaintiff Larsen to fall back into a bush, cutting her right wrist and right calf badly.

362.    Around 7:45 p.m., more Chicago police arrived in full, green military gear and began to march toward the protesters. The Chicago police began spraying canisters of tear gas or pepper spray that created white smoke, causingPlaintiff Larsen and others to plead: "please no, don't do it!" and "you don't have to do it!"

363.    After Chicago police officers broke through the line of protesters, Plaintiff Larsen crouched down to protect a protester next to her, whose head was unprotected in fear that the officers would begin to strike them with batons.

364.    While Plaintiff Larsen was crouching on the ground, an unidentified Chicago police officer began to spray tear gas or pepper spray from a canister directly at her from only a few feet away. Plaintiff Larsen got sprayed with the gas or pepper spray all over her body, causing her to cough uncontrollably and her entire body to burn.

365.    Another protester helped Plaintiff Larsen get off the ground and to a medic on a hill north of the statue. The medic sprayed water in their burning eyes. Plaintiff also had to take off their mask because it was filled with mucus after coughing from effects of the chemical agent.

366.    Because of the gas or pepper spray, Plaintiff Larsen could not see for at least fifteen minutes.

367.    Plaintiff Larsen and others marched to the intersection of Balbo Drive and Columbus Drive, and gathered together to try to assess who had been arrested and how to help people get home.

368.    Around 9:00 p.m., Plaintiff Larsen was helping protect people from oncoming traffic on Columbus Drive when a line of Chicago police officers on bikes charged at the protesters at full speed. Plaintiff Larsen and the protesters shouted at the officers to slow down but they continued at full speed and an unidentified Chicago police officer on his bike slammed into Plaintiff's shoulder, causing her to spin. Plaintiff observed another Chicago police officer slam into another protester while the officer screamed "Fuck you!"

369.    Plaintiff Larsen's burns from the tear gas or pepper spray burned all through the night and until late afternoon the next day.

370.    Plaintiff Larsen did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

371.    Plaintiff Larsen did not commit any unlawful act and was engaging in constitutionally protected activity.

372.    At the time the officers used excessive force against Plaintiff Larsen, the officers knew that Plaintiff Larsen was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Larsen.

373.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Larsen suffered and continues to suffer, *inter alia,* bodily injury to their right wrist and calf, and burning to their body, pain and suffering, extreme mental distress, anguish, and fear.

### vi.    July 17, 2020 Abuse of Plaintiff Luis Aldair Rafael-Nietes (Grant Park)

374.    On July 17, 2020, Plaintiff Luis Aldair Rafael-Nietes went to the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) at Buckingham Fountain in Grant Park.

375.     Plaintiff Rafael-Nietes attended the demonstration as a volunteer medic because he had completed emergency medical training at Malcolm X College.

376.     At approximately 8:00 p.m., Plaintiff Rafael-Nietes had followed the protest to the area of 1200 South Columbus Drive near the base of the Columbus statue in Grant Park.

377.     At that time, Plaintiff Rafael-Nietes observed a Chicago police officer pin a protester to the ground with a bicycle and then proceed, with a closed fist, to repeatedly punch the defenseless protester in the face without provocation.

378.     Plaintiff Rafael-Nietes verbalized his concern to the Chicago police officer, specifically expressing that he understood if the officer was going to arrest the protester but there was no reason to continue punching them in their face.

379.     At this point, without any warning or justification, an unidentified Chicago police officer picked up a white colored pipe from the ground and brutally struck Plaintiff Rafael-Nietes in his head, causing him severe pain and blood to stream down his face and in his eyes.



380.     Plaintiff Rafael-Nietes observed this unidentified Chicago police officer striking other civilians with the pipe and asked the officer to identify himself by his badge number.

381. This unidentified Chicago police officer responded by turning his body to obscure his identifying insignia, walking away and throwing the pipe to the ground far away from himself.

382. Plaintiff Rafael-Nietes did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

383. Plaintiff Rafael-Nietes did not commit any unlawful act and was engaging in constitutionally protected activity.

384. At the time the officers used excessive force against Plaintiff Rafael-Nietes, the officers knew that Plaintiff Rafael-Nietes was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Rafael-Nietes.

385. As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Rafael-Nietes suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

**vii. July 17, 2020 Baton Attacks of Plaintiff Kathleen Roberts (Grant Park)**

386. On July 17, 2020, Plaintiff Roberts arrived at Buckingham Fountain around 4:00 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

387. After listening to speakers and watching ceremonies, Plaintiff Roberts and her partner, with their bikes, went to the Columbus statue.

388. Around 6:00 p.m., Plaintiff Roberts formed a line with other protesters and their bikes. Plaintiff was standing in the line when officers started to use their bikes to break through the line.

64

389.    Without any warning or justification, an unidentified Chicago police officer pushed Plaintiff Roberts with his baton while holding it horizontally with hands on each end, knocking her to the ground. The officer also took Plaintiff Roberts' bike and threw it behind him.

390.    When Plaintiff Roberts attempted to get back up, the officer pepper sprayed or tear gassed her directly in the face. The chemical agent burned her eyes and her skin, causing her to fall back on the ground again.

391.    The officer then grabbed her by her backpack, picked her up, and sat her down on her buttocks.

392.    At this point, Plaintiff Roberts observed  her partner on the ground and Plaintiff attempted to crawl over to her partner. While crawling, the officer repeatedly hit her with his baton in her back and legs without justification.

393.    When Plaintiff Roberts reached her partner, they both helped each other up. After they stood up, the Chicago police officer pepper sprayed or tear gassed Plaintiff Roberts and her partner in the face again. Plaintiff and her partner  received medical treatment by on scene medics who sprayed water and baking soda in her eyes to stop the intense burning.

394.    After receiving medical attention, Plaintiff Roberts tried to find her bike but Chicago police were in front of a pile of bikes, preventing protesters from getting them back.

395.    Plaintiff Roberts was unable to recover her bike.

396.    Plaintiff Roberts did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

397.    Plaintiff Roberts did not commit any unlawful act and was engaging in constitutionally protected activity.

398.    At the time the officers used excessive force against Plaintiff Roberts, the officers knew that Plaintiff Roberts was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Roberts.

399.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Roberts suffered and continues to suffer, *inter alia,* bodily injuries, including bruises on her hip and thigh, heavy menstruation for a week and a half afterward, and burning skin for over 24 hours, as well as pain and suffering, extreme mental distress, anguish, and fear.

### viii.    July 17, 2020 Baton Attacks of Plaintiff Natalie "Byul" Yoon (Grant Park)

400.    On July 17, 2020, Plaintiff Natalie "Byul" Yoon arrived at Buckingham Fountain around 5:00 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).

401.    After listening to speakers and watching Indigenous prayer ceremonies, Plaintiff Yoon began marching down Columbus Drive toward the section of Grant Park containing the Columbus statue around 6:30 p.m.

402.    Plaintiff Yoon, with scores of others, stood in Grant Park and observed individuals and Chicago police officers surrounding the statue.

403.    At one point, after the Chicago police officers surrounding the statue dispersed, a storm of Chicago police officers flooded into Grant Park from many different entry points.

404.    The Chicago police officers descending on the park were aggressive, hostile and they were indiscriminately and unjustifiably swinging their batons at people standing in Grant Park.

405.    One protester was yelling at the Chicago police officers to stop hitting people.

406. A large unidentified Chicago police officer said words to the effect of: "I can do whatever the fuck I want, and I will hit whoever the fuck I want."

407. This unidentified Chicago police officer, without justification, then hit Plaintiff Yoon on the back of her head with his baton, causing her pain and to bleed profusely.

408. Blood poured from Plaintiff Yoon's head and ran down her neck and on her arm.

409. Plaintiff Yoon was then helped by a protester over to sit by a tree in the park, where she was treated by a medic on scene, who washed out the wound on her head.

410. Plaintiff Yoon suffered dizziness from being struck in the head and had to sit for approximately twenty minutes before she could stand and walk.

411. Plaintiff Yoon feared that she was going to pass out.

412. Plaintiff Yoon also breathed the chemical agent used indiscriminately and excessively by one or more unidentified Chicago police officers in Grant Park on people.

413. Eventually, Plaintiff Yoon was able to leave Grant Park and return home.

414. For two days after she was unjustifiably struck in the head with the baton, Plaintiff Yoon was nauseated, fatigued, and suffered from a severe headache and neck pain.

415. Plaintiff Yoon also had trouble concentrating for days which prevented her from being able to work.

416. Days after the demonstration, Plaintiff Yoon sought medical treatment and she was informed by a medical treater that she likely suffered a concussion.

417. Plaintiff Yoon did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

418. Plaintiff Yoon did not commit any unlawful act and was engaging in constitutionally protected activity.

419.     At the time the officers used excessive force against Plaintiff Yoon, the officers knew that Plaintiff Yoon was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Yoon.

420.     As a direct and proximate result of the Defendant Officer' actions as detailed above, Plaintiffs Yoon suffered and continues to suffer, *inter alia,* bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### E.  August 15, 2020 Demonstration Downtown

421.     On August 15, 2020, hundreds of protesters participated in a demonstration downtown that began in the afternoon.  The protesters started at Millennium Park and marched through the streets of downtown before Chicago police officers blocked their route and became aggressive.  Officers surrounded protesters on all sides, engaging in the unlawful tactic of "kettling," and brutally beat many protesters, including youth.









**xv.  August 15, 2020 Abuse of Plaintiff Charlie Atchley (Downtown)**

422.  On August 15, 2020, Plaintiff Atchley arrived at Millennium Park at approximately 4:00 p.m. to participate as a protest marshal in a Black-youth led protest calling for defunding CPD, CPD out of CPS, and abolishing ICE.

423.  Plaintiff Atchley and other protesters marched from Millennium Park to Michigan Avenue, and then turned north on Michigan Avenue towards Wacker Drive.

424.  When the crowd arrived at the intersection of Michigan Avenue and Wacker Drive, the protesters were prevented from walking further north because the Michigan Avenue bridge was raised. As the crowd was standing in the intersection, Plaintiff Atchley observed Chicago police officers forming lines to the east and west of the protesters, blocking them from moving in either direction.

425.  Plaintiff Atchley and other protesters attempted to disperse by taking the only route that Chicago police officers left open, heading back south down Michigan Avenue.

426.  Plaintiff Atchley observed Chicago police officers running quickly into the crowd from the back as other officers attempted to surround the protesters on all sides.

427.     Plaintiff Atchley observed Chicago police officers knocking protesters off bikes, beating them with clubs, and using pepper spray. Plaintiff Atchley and other protesters began to run away from the officers.

428.     The Chicago police officers continued surging toward the protesters, pushing them south on Michigan Avenue, and Plaintiff Atchley and a group of protestors tried to disperse from the protest to the southwest.

429.     After walking south from Michigan Avenue, Chicago police officers kettled Plaintiff Atchley and others and refused to allow them to leave.

430.     Plaintiff Atchley was in the front of the group when Chicago police officers started to lunge into the encircled crowd of people.

431.     An unidentified Chicago police officer began to shove Plaintiff Atchley back into the crowd multiple times using Plaintiff Atchley's bicycle. Unidentified Chicago police officers caused injury to Plaintiff Atchley's leg, including lacerations resulting from the officers repeatedly striking them with their bike.

432.     An unidentified Chicago police officer also repeatedly used a baton to strike Plaintiff Atchley on the back of their head. The baton strikes caused Plaintiff Atchley's glasses to fall off their face. The head strikes caused Plaintiff Atchley to become disoriented and to experience ringing in their ears. An unidentified Chicago police officer struck Plaintiff Atchley in the ribs causing them shortness of breath.

433.     After the unidentified Chicago police officers stopped beating Plaintiff Atchley, Plaintiff Atchley attempted to leave the area without their bicycle and glasses.

434.     As Plaintiff Atchley attempted to leave, Chicago police officers again surrounded them, kettling them against a wall. Officers instructed Plaintiff Atchley and the group to disperse

and threatened them with arrest; however, the officers detained the group and provided them no pathway for dispersal.



435.     Plaintiff Atchley and other protesters attempted to inform officers that some detained protesters were injured and in need of medical attention.

436.     Unidentified Chicago police officers told Plaintiff Atchley and other protesters that they could not leave unless they allowed the officers to search their belongings. Plaintiff Atchley refused to consent to the search, so the unidentified Chicago police officers detained Plaintiff Atchley for an unknown amount of time, before finally allowing them to leave.

437.     Plaintiff Atchley did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

438.     Plaintiff Atchley did not commit any unlawful act and was engaging in constitutionally protected activity.

439.     At the time the officers used excessive force against Plaintiff Atchley, the officers knew that Plaintiff Atchley was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Atchley.

440.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Atchley suffered and continues to suffer, *inter alia,* bodily injury, including

bruising to their legs, back, and side, shortness of breath, trouble sleeping, a limp, as well as pain and suffering, extreme mental distress, anguish, fear, and the loss of their bicycle and glasses.

### III. CPD's Policy and Practice Failures: Using Force Against Protesters, Unreasonable Force When No Force Is Required, Failure to Train, Monitor, Supervise, Discipline and Maintaining a Code of Silence

441. The City's long-standing policies, practices, and customs for shutting down protests are the direct and proximate cause of the constitutional violations outlined in this Complaint. Protesters suffered abuse at the hands of Chicago police officers in different parts of the City, however, each instance of harm was a direct result of the City's deficient policies and practices as detailed below.

### A. CPD's Policy and Practice of Using Unreasonable Force, Violence, and False Arrests to Quell Protest

442. CPD's actions during the summer of 2020 were far from isolated incidents. The violations of Plaintiffs' constitutional rights were the result of the CPD's longstanding policies and practices of attempting to quell protest through unconstitutional tactics against protesters including excessive force, violence, and false arrests.

443. CPD has demonstrated a widespread practice of inflicting unconstitutional violence on people exercising their right to assemble and protest, along with unlawfully depriving people of their freedom in retaliation for their protest activities. Some notable examples include:

    a. On April 23, 1990, CPD responded to an AIDS Coalition to Unleash Power ("ACT-UP") protest by pushing, shoving, tackling, and throwing protesters to the ground, and falsely arresting protesters.

    b. On December 29, 1990, CPD responded to a Gulf War protest by striking protesters in the face, placing them in choke-holds, and conducting false arrests

against bystanders opposing their conduct and concert-goers simply leaving the venue.

c. On June 24, 1991, CPD used forced against protesters at another ACT-UP demonstration. One officer threw a protester on the pavement, punched him in the face, and falsely arrested him. A dozen other ACT-UP activists who suffered serious injuries including bruises and contusions, a fractured wrist, and head injuries all filed excessive force lawsuits, which were settled by the City for substantial money damages.

d. During the Democratic National Convention in August 1996, CPD falsely arrested and injured several protesters. More than half a dozen plaintiffs brought an excessive force and false arrest lawsuit that was settled by the City for substantial money damages.

e. On March 20, 2003, CPD responded to a mass demonstration and march against the War in Iraq by trapping over 800 protesters and by-standers on Chicago Avenue without giving people orders to disperse and opportunities to leave, and arresting over 500 people. CPD also engaged in excessive force, which included storming into the crowd and striking people with batons. A federal class action lawsuit filed against the City on behalf of the protesters, which included a claim for municipal liability under *Monell*, ultimately settled for approximately $15 million.

f. On August 17, 2011, CPD responded to an anti-deportation demonstration by hitting two legal observers in the face and falsely arresting the legal observers after they attempted to assist a young woman and child that had been battered by

a CPD officer.

g. On March 11, 2016, CPD responded to an anti-Trump demonstration by pushing protesters with batons, physically attacking protesters, and falsely arresting protesters. One woman was thrown to the ground by her hair, kicked on her body, and beat with batons on her head and body, and falsely arrested by CPD officers. CPD officers also attacked and falsely arrested a member of the press.

**B.    CPD's Widespread Practice of Excessive Force**

444.    The CPD's violence and brutality against protesters is consistent with the Department's widespread policy and practice of using aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. The CPD also fails to de-escalate encounters when it would be reasonable to do so. Even where some use of force may be justified, officers, as a matter of practice, use a higher level of force than is objectively reasonable. CPD's violence against protesters—and particularly against protesters who stand in opposition to police violence, corruption, and racism—is an extension of CPD's long standing, widespread practice of excessive force. This widespread practice of violence has been documented and acknowledged by the DOJ, the Chicago Police Accountability Task Force (the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the Black communities most targeted by CPD for violence and abuse.

445.    In April 2016, the Task Force released a report about the system of training, accountability, and oversight of CPD officers (the "Task Force Report"). It found: "The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with

the police over an extended period of time.  There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself."

446.    The Task Force reported that racial bias in the CPD was "not a thing of the past." Instead, "data establishes that CPD's use of force disproportionately affects people of color.  The same is true for foot and traffic stops.  These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. Racial bias extends to other areas as well, including the police oversight system itself."

447.    In 2015, the Department of Justice, Civil Rights Division, Special Litigation Section, and the U.S. Attorney's Office for the Northern District of Illinois jointly initiated an investigation of the CPD and the accountability body charged with overseeing the police—the Independent Police Review Authority ("IPRA").  This investigation was undertaken to determine whether the CPD was engaging in a pattern or practice of unlawful conduct and, if so, what systemic deficiencies or practices within the CPD, IPRA, and the City constituted this pattern or practice.  The DOJ investigation assessed the CPD's use of force, and addressed CPD policies, training, reporting, investigation, and review related to officer use of force.

448.    In January 2017, the DOJ finished its investigation and released its findings (the "DOJ Findings Report").  In accordance with the allegations herein, the DOJ Findings Report concluded that "CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive  . . . CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD."

449.    Based on its review of complaints, the DOJ determined that uses of force by the CPD "were not aberrational."  Instead, "our holistic review of this information, combined with our investigation of CPD's training, supervision, accountability, and other systems, give us reasonable cause to believe that the unreasonable force we identified amounts to a pattern or practice of unlawful conduct."

450.    The CPD's pattern or practice of unreasonable force also includes the unnecessary, unjustified use of excessive, less-than-lethal force, including with Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat.  According to the DOJ, the use of unreasonable force to quickly resolve non-violent encounters is a recurrent issue at CPD.

451.    The CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force.  The CPD also fails to de-escalate encounters when it would be reasonable to do so.

452.    The DOJ observed this trend of escalation in shootings, finding that CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable uses of force and resulting harm, including deaths."  The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped, without cause.

453.    In one incident recorded by the DOJ, officers forcibly brought a man to the ground because he stiffened and locked his arms while they were arresting him for walking his dog without a leash and refusing to present identification.  Officers provided no justification for the level of force they used.  They failed to explain why they did not attempt to resolve the situation with common (and common sense) de-escalation techniques.

454.    The Task Force similarly found "many examples of CPD encounters with citizens in routine situations that have gone tragically wrong."  The Task Force acknowledged

widespread reports from Chicagoans that officers approach "routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language."

455.    The DOJ investigation and the Task Force findings directly resulted from the uprisings that occurred in the aftermath of the 2015 release of the video depicting CPD Officer Jason Van Dyke murder Black teenager Laquan McDonald.  Some of the groups that provided foundation, leadership, and support for these uprisings, including Black Lives Matter-Chicago, filed a lawsuit seeking a consent decree that would govern CPD operations and prevent future abuse and racialized violence and won the right to enforce the Consent Decree that ultimately resulted from litigation filed by the Illinois Attorney General.[14]  Even though the Consent Decree contains a number of provisions that should have remedied the policy and practice violations described in this Complaint, as described fully below, CPD has entirely failed to conform its practices to Consent Decree mandates.

### C.    The CPD Has Wholly Disregarded Consent Decree Requirements

456.    An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports.  (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.)  The IMT has so far issued two reports with a clear trend across both: the City and CPD have failed to comply with the reform schedule.  In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree.  The City and CPD missed 37 of 50 deadlines.  The City's record in the second report was no better.  In that report, filed on June 18, 2020, the City and CPD missed 52 of 74

---

[14]  Organizations represented by the ACLU of Illinois and the Attorney General of the State of Illinois later filed their own lawsuits and eventually, these efforts resulted in a Consent Decree that has been in effect since April 2019.

deadlines.

457.     The City's non-compliance and missed deadlines bear directly on CPD's civil rights abuses at the recent protests.  CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies.

458.     In its First Report (1:17-cv-06260 "Report 1") filed on November 15, 2019, the IMT described the CPD's consistent failures across the assessed paragraphs of the Consent Decree.  In terms of impartial policing, ¶ 58 requires that the CPD establish a policy to permit "members of the public to photograph and record CPD officers in the performance of their law enforcement duties."  CPD failed to meet any level of compliance with the paragraph or the corresponding deadline in the Consent Decree.  Even so, the IMT described the ¶ 58 policy as "necessary" given CPD unwillingness to be photographed.  (Report 1 at 50.)  Furthermore, the CPD refused to allow for community engagement in the creation of the draft policy, which is a requirement of the Consent Decree.  *See* ¶ 52.

459.     In terms of use of force, CPD missed 16 out of 19 deadlines, and failed even preliminary compliance for 19 out of 25 Consent Decree paragraphs.  CPD did not achieve secondary or full compliance in any paragraphs concerning use of force.  CPD's use of force failures break down into policy and reporting deficits.  When reviewing the CPD's approach to use of force generally, the IMT explicitly recommended that "the CPD provide more detailed examples of various de-escalation techniques in each policy, rather than rely on the boilerplate language that is at the front end of each policy."  (Report 1 at 85.)

460.     The Consent Decree requires that every two years, the IMT conduct a reliable, representative, and comprehensive survey of broad cross sections of Chicago's communities.

The most recent survey, released in August 2020, reveals that community members are well aware of CPD's failures to comply with the Consent Decree requirements. Less than half of people surveyed believe that CPD generally uses forces appropriately or adequately de-escalates situations.

461. The Consent Decree provisions related to the allegations in this Complaint include a number of provisions, that, if meaningfully implemented by the CPD prior to the Summer 2020 uprisings, were intended to prevent the injuries detailed in this Complaint. These provisions include the following requirements and prohibitions:

    a. Chicago police officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.

    b. When safe and feasible to do so, Chicago police officers must give verbal commands and warnings prior to, during, and after using an impact weapon.

    c. Chicago police officers must receive training on proper use of an impact weapon before being permitted to carry such a weapon.

    d. Chicago police officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. Chicago police officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.

    e. Chicago police officers may only use force for a lawful purpose. Chicago police officers are prohibited from using force as punishment or retaliation, such as

using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).

f.  The CPD will clarify in policy that Chicago police officers will permit members of the public to photograph and record Chicago police officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy.

g.  Chicago police officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).

h.  Chicago police officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.

i.  The CPD will require that all Chicago police officers interact with all members of the public in an unbiased, fair, and respectful manner. The CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.

**D.  The CPD's Widespread Failures to Train, Monitor, Supervise and Discipline Abusive Officers and Maintaining a Code of Silence**

462.  The CPD has maintained its widespread practice of excessive force for well over 100 years through promoting the "code of silence" and the failure to discipline Chicago police

officers trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing. Any officer who violates this code is penalized by the CPD.

463. Police officers are educated at the CPD about the tenets of this code of silence. They are instructed: "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

464. In *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

465. In December 2015, in a speech to Chicago aldermen, Mayor Emanuel acknowledged that Chicago police use a "code of silence" to conceal abuses and wrongdoing by their colleagues.

466. In April 2016, the Task Force found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

467. The DOJ investigation confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street." The code of silence

extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

468.    The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth."  This is because "officers do not believe there is much to lose by lying."

469.    The CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers, in the manners described in this Complaint as well as, inter alia,

a) Refusing to honor and uphold the First Amendment rights of the people;

b) Facilitating, encouraging and allowing police officers to refuse and fail to indentify themselves to members of the public they serve;

c) Facilitating, encouraging and allowing police officers to cover their badges, refuse to wear identifying helmets and/or obscure their identities in other ways to the public; and,

d) Facilitating, encouraging and allowing police officers to fail to complete adequate and comprehensive paperwork when exercising force on members of the public.

470.    Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence.  These policies, practices, and customs directly contribute to the code of silence, and to the violations of Plaintiffs' constitutional rights.

471.    According to the Citizens Police Data Project, between 1988 and 2020, only 3% of all complaints that CPD officers engaged in excessive force resulted in any discipline for the officer and only 1% of complaints related to First Amendment violations resulted in discipline. The DOJ reported that in the rare instance where a complaint of misconduct was sustained, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter

misconduct."

472.    Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty.  From 2007 to 2015, more than 1,500 Chicago police officers acquired ten or more Complaint Registers ("CRs").  Sixty-five of these officers had 30 or more CRs.  These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers.  They also underreport the problem.  While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete and analysis is limited.

473.    Given the lack of effective review or discipline, officers often use the same or similar language to justify their use of force.  As the DOJ determined: "We saw many instances where officers justified force based on a boilerplate description of resistance that provides insufficient specificity to understand the force used or resistance encountered."  The CPD regularly accepts such insufficient documentation without question, even when an officer's use of force is suspect or gives rise to a formal complaint.

474.    While a number of Consent Decree provisions aim to eliminate the code of silence, the CPD has failed to comply with these terms.  IMT reports overarching concerns about the entire complaint process.  Specifically, the CPD failed to implement a policy in which the public knows how to submit complaints and that they may do so in multiple ways (¶¶ 425-26).  The IMT found that, for anyone looking for more information on filing complaints, the reporting page and helpful resources are hard to find.  The CPD reporting website is not user friendly, especially for non-English speakers.

475.    Furthermore, the CPD failed to ensure that officers who report misconduct receive protection (¶ 436).  The CPD also failed to create a written policy detailing how complaints will be transferred to the Accountability Sergeant (¶ 457).  The draft policy the CPD created "does

not specifically address why, when, or how an investigation will be transferred." Further, the CPD has failed to support the implementation of a "completely anonymous, double-blind safe space portal" developed by the Officer of Inspector General, Joseph Ferguson. The portal intended to facilitate anonymous complaints from Chicago police department officers, but CPD has failed to take the actions necessary to ensure that it is used to defeat the code of silence.

476.    In the Second IMT Report (1:17-cv-06260), filed June 18, 2020, the CPD continued its pattern of systematic non-compliance with the assessed paragraphs of the Consent Decree.  The CPD's failures relate directly to the abuses witnessed at the recent protests.

**E. Governmental Reports and an Investigation by the Federal Consent Decree Monitor Document CPD's Widespread Policy and Practice Violations During the 2020 Uprisings**

477.    In February 2021, the Chicago Police Department released a 26-page report: *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020*.[15]  CPD's After Action report failed to address many of the obvious policy and practice failures identified throughout this complaint (including but not limited to the use of lethal force against peaceful protesters).  However, in this report, the CPD makes a number of key admissions about its failed response to the 2020 uprisings.  Those admissions include:

    i.    CPD officers were not prepared to respond to "large-scale, unplanned incidents."[16]

    ii.   CPD's training failed to prepare newer officers for wide scale protests and CPD officers failed to comply with existing policies regarding mass

---

[15] *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020,* The Chicago Police Dept. (February 2021)  https://home.chicagopolice.org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf (hereinafter "CPD After Action Report").
[16] *Id.* at 5.

arrests.[17]

 iii. CPD officers were deployed to respond to the protests without any "specific plans"—a decision the CPD calls "ineffective."[18]

 iv. "[S]ome Department members were observed during the Events with their names and/or badges removed from their uniforms or otherwise obscured in violation of Department policy."[19]

478. The CPD's After Action report is also important for what it omits. For example, it failed to note CPD officer's well documented policy violations relating to batons and other uses of force.[20] The report also fails to mention the physical and emotional trauma protesters described during federal court proceedings—yet it described in some detail the harm suffered by the business community.[21] The report notes that in the wake of the 2020 uprisings, the CPD secured donations of 1,650 ballistic helmets with Kevlar protection and laser beam reflections that will protect officers from "blunt trauma."[22] Yet it is silent about any concrete action the CPD plans to take to protect protesters from further harm at the hands of CPD officers.

479. Also in February 2021, the Officer of the Inspector General for the City of Chicago released a Report on Chicago's Response to George Floyd Protests and Unrest.[23] That

---

[17] *Id.* at 6, 9.

[18] *Id.* at 8.

[19] *Id.*

[20] Both the Inspector General and the Independent Monitor detail CPD's force-related violations making CPD's own omission all the more troubling. *See also Report on Chicago's Response to George Floyd Protests and Unrest,* CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, 15 (February 18, 2021) https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf ("Many participants and observers who gave testimony after these events described dangerous baton strikes and other reportable uses of force that are not reflected in CPD's reported data. CPD's after-action report does not acknowledge and does not attempt to rebut these claims.").

[21] CPD After Action Report, at 6.

[22] *Id.* at 14.

[23] *Report on Chicago's Response to George Floyd Protests and Unrest,* CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, 15 (February 18, 2021) https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf (Hereinafter "OIG Protest Report")

report was based on "thousands of documents" and more than 70 interviews conducted with

CPD officials.[24]  The OIG Protest Report also relied upon testimony from protesters provided

during federal court proceedings, arrest reports, and an analysis of over 100 hours of body worn

camera footage.[25]  Based on this information, the OIG made the following findings:

> i. CPD made more than 1,500 related arrests between May 29 and June 7,
> 2020. The OIG documented that CPD failed to train officers on mass
> arrest procedures and held protesters "without proper documentation" and
> "threatened" the safety of protesters through lengthy delays in
> transportation and processing.[26]  The report further describes CPD's arrest
> related records as "uneven and incomplete."[27]

> ii. CPD officers detained protesters for prolonged time periods: "on average,
> arrestees were detained for a total of 14.0 hours.  The briefest total
> detention time recorded was 1.2 hours and the longest was 53.3 hours."[28]

> iii. The OIG Protest Report contains extensive documentation regarding
> CPD's failures to "fulfill its force reporting obligations" and to "provide
> clear and consistent guidance to officers on reporting obligations."[29]  The
> report notes that there was significant confusion among "CPD's highest
> ranks" and "rank and file" members about the reporting requirements
> during the uprisings.  As a result, "CPD underreported uses of baton

---

[24] *Id.* at 6.

[25] *Id.* at 7.

[26] *Id.* at 9.

[27] *Id.*

[28] *Id.* at 91.

[29] *Id.* at 9.

strikes and manual strikes, further resulting in an inadequate record of severe and potentially out of policy uses of force."[30]

iv. Superintendent Brown provided CPD officers with a general authorization for the use of OC spray when he considered "looting and violence" to be widespread throughout the city.[31] He further authorized the use of OC spray during "situations involving large crowds acting as non-compliant groups, active resisters and assailants."[32]

v. On May 30, Mayor Lori Lightfoot herself authorized the use of O.C. spray against protesters at Trump Tower, many of whom were peaceful protesters.[33]

vi. Despite these relatively limited authorizations, CPD officers reported that they used OC spray on peaceful protesters, including in efforts to "move protesters off the bridges" and "to slow down the movement of protesters through the city."[34]

vii. The OIG report also documented that CPD's SWAT team deployed OC spray against crowds 85 times on May 30, 2020.[35] However, because of the lack of accurate reporting, CPD officers used personal OC spray (and failed to report it) on far more occasions.

viii. The OIG Protest Report further describes how CPD exempted from review

---

[30] *Id.*
[31] *Id.* at 108
[32] *Id.* at 109.
[33] *Id.*
[34] *Id.*
[35] *Id.* at 49.

force the CPD officers used during the uprisings. None of the CPD officer's uprising force was reviewed by the Force Review Division, which conducts internal and non-disciplinary reviews of force in order to ensure "reporting obligations are met" and to identify "tactical, equipment or policy concerns."[36] As a result, CPD officer use of force during the uprisings was not subject to any meaningful accountability process. The report further notes that multiple reports documenting mass use of OC spray at different locations contained identical language justifying the use OC spray.[37] The use of boiler plate language to justify CPD officer use of force against different people in different locations further demonstrates the complete breakdown of reporting and force related accountability processes.

ix. The OIG Protest Report describes other forms of CPD violence during the uprisings. Specifically, the report documents that "protesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They describe seeing CPD members tackle, punch and use batons to strike peaceful protesters in the head and neck."[38]

x. CPD policy restricts the circumstances under which officers can use baton strikes, yet despite the existence of this policy the OIG found evidence of widespread policy violations during the uprisings.[39] Under CPD policy,

---

[36] *Id.* at 110.
[37] *Id.* 111.
[38] *Id.* at 37.
[39] *Id.* at 95.

89

baton strikes to the head are considered lethal force and can only be used against people attempting to harm CPD officers. The OIG documented that CPD officers both failed to accurately report these instances of lethal force and that "reports from community members who participated in the protests suggest that CPD members' use of batons was both substantially more widespread and more dangerous than indicated . . . by officers."[40]

xi. The OIG Protest Report describes how, given CPD's reporting failures, it is difficult to specifically quantify the number of protesters who were subject to lethal force by CPD officers, but notes that community member and protesters provided compelling narratives of this widespread policy violation. ". . .[C]ommunity members. . . describe multiple instances of baton strikes. One community member reported seeing people beaten with batons at the protests "tens of times." Another described seeing someone beaten "on the ground while handcuffed." The testimonials in court included descriptions of protesters beaten with batons "until they were bleeding," and protesters struck with batons in response to minor provocations by someone else (e.g., the throwing of a water bottle). Ghian Foreman, President of the Chicago Police Board, gave a public statement that he was "a victim of police aggression" when he was struck five times in the legs with batons while walking through the scene of a protest."[41]

xii. The OIG Protest Report notes that on May 30, 2020, "CPD officers used

---

[40] *Id.* at 113
[41] *Id.* at 114.

their batons to push protesters off the bridge onto Lower Wacker Drive. Accounts from protesters on the bridge note that they did not hear a dispersal order before officers began to push them with batons. . . During the push, protesters described being beaten with officers' batons, punched, and kicked as CPD tried to clear the bridge"[42]

xiii.  The OIG report includes summaries of body worn camera footage that further documents the policy and practice violations that give rise to the Plaintiffs' claims.  Including:

a.  During one incident, body worn camera depicts CPD officers ignoring a protester who requested seizure medication.  After the protester had an apparent seizure in a CPD vehicle, and while observing the protester lying face down in the vehicle, the CPD officer was captured on video saying  "chick's having a seizure I guess."  The officer notes the protester is apparently breathing and states that nothing else can be done.[43]

b.  A CPD officer is recorded as saying to a passive protester "I will tase you if you move, do you hear me?"[44]

c.  A CPD officer called a protester a "little bitch" after they complained about pain.[45]

---

[42] *Id.*at 41.

[43] *Id.* at 51.

[44] *Id.* at 51.

[45] *Id.*

d.  A CPD officer was recorded telling other officers that he made a protester cry by telling them they would be raped in jail given their small size.[46]

e.  A CPD officer was recorded hitting a protester three times on the head while the protester was laying face down on the floor.  These strikes included punches to the head and neck area.[47]

xiv.  The OIG Protest Report describes how CPD's operational response to the protests "crippled the accountability processes from the start."[48]  The accountability process was defeated by CPD's failure to ensure that all officers had functioning body warn cameras and CPD officers' "obscuring their badge numbers and nameplates" during the protests.[49]

480.  In July 2021, the Independent Monitor Team (IMT) responsible for overseeing the City's compliance with the consent decree governing CPD operations issued a 464-page report that addresses the City's and the CPD's "response to protest and unrest under the consent decree."[50]  That report contains the following findings:

i.  The IMT Protest Report describes hearing "from many community member who expressed new fears, frustration, confusion, pain and anger regarding their experiences with officers during protests."[51]  Protesters

---

[46] *Id.*

[47] *Id.* at 114.

[48] *Id.* at 9.

[49] *Id.* at 10.

[50] *Illinois v. City of Chicago*, 17-CV-6260, 6 (N.D. Ill. 2021) (Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protest and Unrest Under the Consent Decree) (Hereinafter "IMT Protest Report").

[51] *Id.* at 12.

describe to the IMT how CPD officers verbally abused them, pushed and shoved them, tackled them to the ground, pulled their hair, struck them with batons, fists, or other objects and sprayed them with pepper spray. Protesters also described enduring physical and mental and emotional injuries as result of CPD's violent, abusive conduct, including head injuries and ongoing emotional trauma.[52]

ii. The IMT Protest Report further concluded that CPD and the City did not have the "polices, reporting practices, training, equipment, data analysis, community engagement or inter agency coordination required to respond effectively" to the protests.[53]

iii. The IMT Protest Report documented that "some officers engaged in various levels of misconduct and excessive force."[54] The IMT also reports that because of CPD's officers' failure to wear body cameras and comply with reporting requirements "the actual number of use of force incidents may be unknowable, including how often O.C. spray was used."[55]

iv. The IMT described how CPD officers were "deployed without their equipment" including body worn cameras.[56] "According to CPD, there were at least 5,676 officers who responded to protests and unrest between May 1, 2020, and August 12, 2020, without body-worn cameras. The IMT described how "supervisors instructed [officers] to not have the

---

[52] *Id.* at 13.
[53] *Id.* at 14.
[54] *Id.* at 15.
[55] *Id.* at 18.
[56] *Id.* at 14.

cameras on the entire time while responding to crowds during 12-hour shifts to preserve battery life."[57]

    a.  The IMT found that what body camera footage does exist often depicted CPD officers violating law and policy including the following incidents: The IMT described video footage that reveals "many examples of officers communicating disrespectfully and using force."[58]

    b.  In one instance the IMT documents footage depicting CPD officers "charging at people as the crowd disperses . . . One officer can be seen pushing and nearly tackling a person who appears to be standing by observing the incident."[59]

    c.  "Another video depicts officers pushing and shoving people after a commotion breaks out and then throwing and tossing bikes, and another video depicts officers tackling some people amidst a commotion of pushing and shoving between people in the crowd and officers."[60]

    d.  One video from May 30, 2020 depicts an officer aggressively pushing, tackling, and fighting with people on the ground and then arresting people.[61] Another video from the same day show officers pushing, showing, and pulling

---

[57] *Id.* at 140
[58] *Id.* at 56.
[59] *Id.*
[60] *Id.*
[61] *Id.* at 70.

people and using batons to push against protesters. Additional video depicts officers throwing bikes, drawing their batons at crowds that are dispersing, pushing, and shoving. In one particularly violent incident "one officer tries to restrain a woman on the ground, other officers yell, "Pick her up." The officer continues to drag the woman a couple of feet before trying to pick her up."[62]

e. The IMT describes camera footage depicting CPD officers denying water to a pregnant, Black protester who CPD officers arrested. The officers then mocked the women for her request. The report contrasts the callous disdain the officers exhibited towards this women with the permissive, gentle approach officers used with a white male protester who was allowed to walk away from the same scene merely because he promised officers he would go home.[63]

f. The IMT Protest Report documents video evidence demonstrating officers swearing at protesters, threatening them, and calling protesters slurs like "pussy ass bitch" and "big ass bitch."[64]

g. IMT reviewed videos that "also depicted many instances of officers using force, including baton strikes and punches.

---

[62] *Id.* at 71.
[63] *Id.* at 71.
[64] *Id.* at 71, 77.

For example, one video shows an officer jogging into the crowd. He then appears to turn toward someone, then grabs and starts punching the person. In another instance, an officer gets into a tug-of-war with someone over a bike, and then appears to throw the bike at the person. The person gets upset, begins walking towards the officer and stops. Then the officer walks toward the person, further closing the gap between them, and shoves the person. There was also footage of an officer swinging his baton like a baseball bat."[65] The IMT Protest Report also describes CPD officers' indiscriminate use of O.C. spray.[66]

h. The IMT noted that videos also depicted CPD officers engaging in inherently escalatory behavior. In "several videos where officers appeared to advance, narrowing the spatial gap between the officers and the crowd, but gave the crowd no prior or subsequent instruction that would justify the officers getting closer (i.e., communicating the need for the crowd to move back).[67] Additionally, "there were times when officers had their batons in their hands even when the crowd was docile or, in several instances, when officers were not near a crowd at all. Officers would often walk

---

[65] *Id.* at 95.
[66] *Id.* at 95.
[67] *Id.* at 129.

toward crowds with them."[68]  "[S]ome officers may be more willing to start disrespectful interactions with people in crowds—or worse."[69]

i. Body worn camera footage also revealed the depth of the animus CPD officers hold against protesters.  According to the IMT's review "in a number of instances, CPD officers made disparaging remarks about community members.  For instance, officers said things such as the following: "Somethin' gonna happen tonight.  I wanna hit this mother fucker right here.  There's more people coming.  They think they're something.  They all need they ass whooped.  It's embarrassing."[70]  "In other instances, [CPD officers made] common references to community members as 'animals' and 'savages,' particularly when referencing people who were looting or participating in violence."[71]

**LEGAL CLAIMS**

**COUNT I – 42 U.S.C. § 1983**
**Unlawful Policy and Practice**

481.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

482.    Count I is alleged against Defendant City of Chicago.

---

[68] *Id.* at 130.
[69] *Id.* at 193.
[70] *Id.* at 194.
[71] *Id.*

483.     The individual Defendant Officers acted under the color of law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department, to violate Plaintiffs' rights as set forth herein.

484.     The City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated *de facto* policies, practices, and customs which included, *inter alia*:

  a.  Using excessive force against protesters without justification, including but not limited to: beating individuals with batons; beating protesters through punching, kicking, kneeing, and stomping; using chemical agents like pepper spray and tear gas; tackling protesters to the ground; and hitting individuals with bikes.

  b.  Using lethal force against protesters, including but not limited to striking protesters on the head and neck with batons.

  c.  Retaliating against protesters who record the police and/or speak out against police violence.

  d.  Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate CPD's animus toward protesters.

  e.  Falsely arresting protesters for engaging in protected speech and assembly.

  f.  Targeting those the CPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false arrest.

  g.  Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas.

h. Using chemical agents like pepper spray and/or tear gas without prior warning.

i. Breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, and backpacks.

j. Failing to intervene to prevent police violence and other forms of misconduct.

k. Failing to hold officers accountable who violate protesters' rights.

l. Failing to train officers on how to appropriately respond to protesters.

m. Maintaining, condoning, and failing to take any steps to end the code of silence in the CPD that allows Chicago police officers to violate protesters' and other civilians' rights with impunity;

n. Maintaining, condoning and failing to take appropriate steps to prevent the abuse of civilians by unidentified officers;

o. Failing to put in place appropriate policies and practices to require police officers to identify themselves when making physical contact with the public;

p. Failing to identify police officers who are accused of misconduct so that their conduct may be appropriately investigated and officers disciplined if necessary;

q. Failing to adequately supervise police officers so that they are not allowed to commit misconduct under the cloak of anonymity.

485. The interrelated policies, practices, and customs alleged above are entrenched, repeated, obvious, notorious and well-known within the CPD.

486. The CPD is aware of the harms suffered by Plaintiffs and other protesters as a result of the interrelated policies, practices, and customs alleged above.

487. The City has implemented, enforced, encouraged, and sanctioned CPD's policies, practices, and customs alleged above in violation of Plaintiffs' and other protesters' First, Fourth, and Fourteenth Amendment rights.

488. The City has acted with deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of Plaintiffs. As a direct and proximate result of the acts and omissions of the City and CPD, the First, Fourth, and Fourteenth Amendment rights of Plaintiffs have been violated.

489. Defendant Superintendent Brown, in his role as Superintendent of the CPD, was the final policymaker for CPD's response to the protests.

490. Defendant Superintendent Brown developed and maintained policies, practices, procedures, and customs of Chicago Police officers using excessive force against protesters and falsely arresting protesters, exhibiting deliberate indifference to the constitutional rights of Plaintiffs, including but not limited to those policies, practices, procedures, and customs described above, which caused the violation of Plaintiffs' rights as described herein and the resultant damages suffered.

491. Defendant Superintendent Brown had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

492. Upon information and belief, Defendant Superintendent Brown was deliberately indifferent to the need for further training, supervision, or discipline related to the use of force against protesters, as reflected by the continued maintenance of the policies, practices, and

customs of using excessive force that was carried out by Chicago Police officers under his control.

493.     The actions and omissions of Defendant Superintendent Brown as described herein were done with knowing disregard for the constitutional rights of Plaintiffs.  Defendant Superintendent Brown acted maliciously, willfully, wantonly, and in reckless disregard of Plaintiffs' rights under the Constitution.

494.     The policies, practices, procedures, and customs of the CPD were the direct and proximate cause of the violations of Plaintiffs' constitutional rights and the damages they suffered, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

## COUNT II – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force

495.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

496.     As described in detail above, Chicago Police  Officers used unreasonable and excessive force, without legal cause, against Plaintiffs and/or failed to intervene to prevent the use of excessive force against Plaintiffs, in violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

497.     The misconduct described in this Count was committed by unidentified to date individual police officers under the supervision of Defendant Brown and other as yet unidentified supervisors, who have personal involvement and responsibility for this misconduct.

498.     The misconduct described was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

499. The actions of the Defendant Officers were the direct and proximate cause of the violations of identified Plaintiffs' constitutional rights, bodily injury, pain, suffering, extreme mental distress, anguish, and fear as set forth more fully above.

### COUNT III – 42 U.S.C. § 1983
### Violation of the First Amendment – Freedom of Speech and Assembly, Intimidation and Retaliatory Use of Force

500. Plaintiffs, with the exception of Legal Observer Jacqueline Spreadbury, repeat and re-allege the foregoing paragraphs as if fully set forth herein.

501. As described in detail above, Plaintiffs were participating in lawful, constitutionally protected activity on the public streets of the City of Chicago.

502. The actions of Chicago Police Officers and their supervisors, including Defendant Brown described above violated Plaintiffs' rights to freedom of speech and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution, in that Plaintiffs were abruptly prevented from further exercising their rights and suffered retaliation for having exercised their rights.

503. Defendants retaliated against Plaintiffs for engaging in protected speech by subjecting them to excessive force without legal justification and/or failing to intervene to prevent the use of excessive force. Plaintiffs' protected speech was the substantial and motivating factor for the Police Officers' use of force against them. The Officers' actions were intended to make Plaintiffs and other people engaging in constitutionally-protected speech and assembly at the protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment and were known to their supervisors, including Defendant Brown, who failed to intervene to prevent these violations despite the responsibility and opportunity to do so.

504.    At all relevant times, the Defendants were aware that Plaintiffs were engaged in constitutionally-protected speech and assembly when they violated their rights. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

505.    The actions of the Defendants were the direct and proximate cause of the violations of identified Plaintiffs' constitutional rights, bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

## COUNT IV – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – False Arrest

506.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

507.    Count IV is alleged by Plaintiffs Sowacke and Wise against relevant unidentified Chicago police officers.

508.    The actions by the Defendant Officers in falsely detaining, arresting, and imprisoning Plaintiffs without reasonable suspicion or probable cause violated Plaintiffs' Fourth Amendment rights to be free from unreasonable search and seizure.

509.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

510.    The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, loss of personal freedom, and legal expenses, as set forth more fully above.

## COUNT V – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendments – Unlawful Search and Seizure of Property

511.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

512.     Count V is alleged by Plaintiffs Sowacke, Gervasi, Roberts, and Atchley against relevant unidentified Chicago police officers.

513.     The actions by the Defendant Officers in knowingly searching and seizing Plaintiffs' property during the events described in the Complaint, without a warrant, probable cause, or legal justification, violated Plaintiffs' right to be free from unreasonable search and seizure of Plaintiffs' property guaranteed by the Fourth and Fourteenth Amendments.

514.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

515.     As a direct and proximate result of the Defendant Officers' actions, Plaintiffs suffered damages, including the loss of their property, as set forth more fully above.

## COUNT VI – 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiffs of Their Constitutional Rights

516.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

517.     Each of the Defendant Officers and supervisors, including Defendant Brown, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

518.     Each of the Defendants took concrete steps to enter into an agreement to unlawfully use force on Plaintiffs, and to detain and arrest certain Plaintiffs, knowing they lacked reasonable suspicions and/or probable cause to do so, and for the purpose of violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights.

519.     In furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of violating Plaintiffs' rights.  They

accomplished this goal by using excessive force on all Plaintiffs and unlawfully arresting certain Plaintiffs.

520.    Each Defendant  is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant Officer.

521.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, and fear as set forth more fully above.

## COUNT VII – 42 U.S.C. § 1983
## Failure to Intervene

522.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

523.    Count VII is alleged against all individual Defendant Officers and Defendant Superintendent David Brown in his individual capacity.

524.    During the events described above, the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments, even though they had the opportunity and duty to do so.

525.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

526.    As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs suffered damages, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear, as set forth more fully above.

## COUNT VIII – Illinois State Law Claim
## Violations of the Illinois Constitution

527.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

528. Count VIII is alleged against all Defendant Officers.

529. The actions taken by the Defendant Officers denied Plaintiffs their state constitutional rights to free expression and assembly in a peaceable manner; as provided by the Illinois Constitution, Article I, sections 1, 2, 4, 5, and 6, and were a direct and proximate cause of Plaintiffs' injuries as set forth above.

530. The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' Illinois State Constitutional Rights.

## COUNT IX – Illinois State Law Claim
## Assault and Battery

531. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

532. Count IX is alleged against all Defendant Officers.

533. As described in detail above, the Defendant Officers physically abused Plaintiffs by, inter alia, pushing and beating them with batons, beating them through punching, kicking, kneeing, and/or stomping, using chemical agents against them, tackling them, and/or hitting them with bikes, causing bodily harm.

534. The actions of the Defendant Officers were affirmative acts and threatened to cause or did cause an unpermitted contact of a harmful and/or offensive nature, to which Plaintiffs did not consent, and thus constitute assault and battery under the laws of the State of Illinois.

535. The actions of the Defendant Officers were committed in a willful and wanton manner.

536. The Defendant Officers' actions directly and proximately caused injury and damage as set forth above.

### COUNT X – Illinois State Law Claim
### Intentional Infliction of Emotional Distress

537.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

538.     Count X is alleged against all Defendant Officers.

539.     The conduct and actions of the Defendant Officers set forth above were extreme and outrageous.  The Defendants' actions were rooted in an abuse of power and authority, and were done intentionally, willfully, and wantonly, and/or knowing that there was a high probability that their conduct would cause Plaintiffs severe emotional distress as set forth above.

540.     As a direct and proximate cause of the extreme and outrageous conduct of the Defendant Officers, Plaintiffs were injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Illinois State law.

### COUNT XI – Illinois State Law Claim
### False Arrest

541.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

542.     Count XI is alleged by Plaintiffs Sowacke and Wise against relevant unidentified Chicago police officers.

543.     As described in detail above, Defendants falsely detained, arrested, and imprisoned Plaintiffs without reasonable suspicion or probable cause and without having reasonable grounds to believe that an offense was committed by Plaintiffs.

544.     The misconduct in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to Plaintiffs' rights.

545.     The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' rights, bodily injury, pain, suffering, mental distress, anguish, loss of personal freedom, and legal expenses, as set forth more fully above.

## COUNT XII – Illinois State Law Claim
## Conspiracy

546.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

547.    Count XII is alleged against all Defendant Officers.

548.    The Defendant Officers together reached an understanding, engaged in and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to violate Plaintiffs' rights guaranteed by the Illinois constitution and to be free from false arrest, malicious prosecution, and the intentional infliction of severe emotional distress on Plaintiffs.

549.    In furtherance of this conspiracy or conspiracies, the Defendant Officers, together with their un-sued co-conspirators, committed the overt acts set forth above.

550.    The Defendant Officers acted with malice, willfulness, and reckless indifference to Plaintiffs' rights.

551.    Each individual Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

552.    The conspiracy or conspiracies were and are continuing in nature.

553.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiffs suffered damages, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

## COUNT XIII – State Law Claim
## Respondeat Superior

554.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

555.    Count XIII is alleged against Defendant City of Chicago.

556.    In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

557.    Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**COUNT XIV – State Law Claim**
**Indemnification**

558.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

559.    Count XIV is alleged against Defendant City of Chicago.

560.    In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

561.    The Defendant Officers acted within the scope of their employment in committing the misconduct described herein.  Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor against the Defendants in the following manner:

1.    Award Plaintiffs compensatory and punitive damages.

2.    Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3.    Award Plaintiffs such other and further relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiffs demand trial by jury.


Dated: February 22, 2024

Respectfully submitted,

/s/ Nora Snyder
Nora Snyder
Janine Hoft, Brad Thomson, Jan Susler,
Ben H. Elson, Hakeem Muhammad
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773-235-0070
norasnyder@peopleslawoffice.com
janinehoft@peopleslawoffice.com
brad@peopleslawoffice.com
jsusler@peopleslawoffice.com
ben@peopleslawoffice.com
hakeemmuhammad@peopleslawoffice.com

/s/ Jonathan Manes
Jonathan Manes
MacArthur Justice Center
160 E. Grand Ave, 6th Fl.
Chicago, IL 60611
(312) 503-0012
jonathan.manes@macarthurjustice.org