UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Tim Anderson, et al.,

       Plaintiffs,

v.

Superintendent David Brown, et al.,

       Defendants.

Case No. 23 C 2245

Honorable Jorge L. Alonso

**Memorandum Opinion and Order**

Defendants City of Chicago and Chicago Police Department Superintendent David Brown (collectively "Defendants") have filed a motion to dismiss certain claims in Plaintiffs' amended complaint, which alleges various constitutional and Illinois state-law violations during the City's police response to protests in the summer of 2020. (ECF No. 26.) As explained below, the court grants in part and denies in part Defendants' motion.

**Background**[1]

**I.    The summer 2020 protests**

This case arises from protests that took place throughout the City of Chicago in the summer of 2020 following the killings of George Floyd, Breonna Taylor, and others. (Am. Compl. ¶¶ 41–43, ECF No. 21.) Plaintiffs allege that Chicago Police Department ("CPD") officers used violent and unconstitutional tactics against protesters who were peacefully exercising their constitutional rights during the protests, including striking them in the head with batons, beating protesters, and trapping them in certain areas (a tactic known as "kettling"). (*Id.*

---

[1] The Court accepts Plaintiffs' well-pleaded allegations in their amended complaint as true for purposes of Defendants' motion to dismiss. *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020).

¶¶ 44–49.) CPD officers also allegedly targeted and used violence against people identified as protest marshals, legal observers, medics, or leaders, those who were documenting police violence, and those who expressed concern with the officers' conduct. (*Id.* ¶¶ 50–52.) Officers also routinely concealed their identities, such as by covering or removing their name plates and badges, otherwise avoided accountability, and took other hostile and discriminatory actions against protesters. (*Id.* ¶¶ 53–58.)

After hundreds of complaints were filed against the CPD, Chicago's Civilian Office of Police Accountability ("COPA") formed a specialized investigation team dedicated to those allegations, which resulted in five officers being referred to law enforcement for potential criminal prosecution and eight officers being recommended for assignment to modified duty or removal of police power. (*Id.* ¶ 60.) COPA's Chief Administrator informed City lawmakers of themes of misconduct during the protests and sent a memo to CPD leadership urging it to take immediate action to address them, which Superintendent Brown received but allegedly did nothing about. (*Id.* ¶ 61.)

Superintendent Brown is responsible for the general management and control of the CPD and made all command decisions about its systematic response to the 2020 protests. (*Id.* ¶ 62.) Superintendent Brown allegedly authorized and directed CPD officers' misconduct and encouraged and permitted officers to target, attack, and harass protesters and made no effort to end the CPD's violence against protesters. Plaintiffs also allege that Superintendent Brown was physically present for at least one protest, though they do not specify which one. (*Id.*) Superintendent Brown also made allegedly false and misleading statements to the media about the protests and officers' conduct, such as stating that officers did not detain a mass of people without justification and without providing opportunities for people to leave. (*Id.*) In October

2020, Superintendent Brown acknowledged ongoing and systemic deficiencies within the CPD when speaking to new CPD recruits, including telling them that some officers had "lost their way," but also saying that the CPD has a culture of "protecting each other" and that "good cops don't tell on the bad cops." (*Id.* ¶ 64.)

## II. Misconduct against Plaintiffs[2]

Plaintiffs describe police violence and misconduct that they and others allegedly were subjected to during the protests, including baton attacks, beatings, abuse, attacks, false arrests, and kettling, which caused their injuries. (*Id.* ¶¶ 66–440.) As part of their allegations, Plaintiffs provide two exhibits, each depicting a particular defendant officer. Exhibit B depicts a defendant officer who had removed his badge from his uniform and struck Plaintiff Marina Bassett with his baton during a protest in downtown Chicago on May 30, 2020. (*Id.* ¶ 93.) Exhibit C depicts an officer who initiated an attack against Plaintiff Copeland Smith during a June 1, 2020 protest in Chicago's Old Town neighborhood. (*Id.* ¶ 286.) Plaintiffs describe misconduct by other unidentified officers during the protests, but, as described further below, do not include those other unidentified officers as defendants.

## III. The CPD's policies and practices

Plaintiffs allege that the abuse they suffered was a direct result of deficient policies, practices, and customs regarding conduct toward protesters that in some cases date back to 1990. (*Id.* ¶¶ 441–43.) These include a widespread policy and practice of aggressive and escalatory tactics that lead to excessive force and other violence against protesters. (*Id.* ¶ 444.)

---

[2] Some of the original plaintiffs have since settled and dismissed their claims; other plaintiffs' names have changed since they filed their complaint. (*See* ECF Nos. 43, 56.)

The CPD's widespread practices of violence and excessive force has been documented by the U.S. Department of Justice, the Chicago Police Accountability Task Force (the "Task Force"), courts, activists, officials, and community members. (*Id.*) For example, an April 2016 Task Force report documented the CPD's system of training, accountability, and oversight for officers and found "substantial evidence" of racially disproportionate force against people of color, particularly African-Americans. (*Id.* ¶¶ 445–46.) A 2017 DOJ report about the CPD's use of force concluded that, among other things, officers "use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD," and "that the unreasonable force [it] identified amounts to a pattern or practice of unlawful conduct." (*Id.* ¶¶ 447–50.) The report also found that the CPD relied on overly aggressive, escalatory, and retaliatory tactics. (*Id.* ¶¶ 451–54.)

The City eventually agreed to a Consent Decree related to the CPD which took effect in April 2019. (*Id.* ¶ 455.) In biannual reports, the Consent Decree's independent monitoring team ("IMT") has found many failures by the City and CPD to comply with the decree's reform schedule, including various preliminary compliance standards and deadlines which bore on the CPD's later use of force during the summer 2020 protests. (*Id.* ¶¶ 456–59.) Among other things, the IMT found that the CPD did not achieve secondary or full compliance with any paragraphs of the Consent Decree regarding use of force. (*Id.* ¶ 459.) Several provisions of the Consent Decree were intended to prevent the kind of injuries Plaintiffs suffered—including provisions concerning baton strikes, medical aid, use of force, and derogatory language. (*Id.* ¶ 461.)

The CPD also maintains a widespread "code of silence" and failure to discipline officers who use excessive force or discriminatory policing. (*Id.* ¶¶ 462–65.) This code of silence has been recognized by the Task Force—which found it was "institutionalized and reinforced by

4

CPD rules and policies"—and the DOJ, which found that it extended "to lying and affirmative efforts to conceal evidence" and to supervisors. (*Id.* ¶¶ 466–68.) The CPD also allegedly maintains a policy, practice, and custom of failing to discipline, supervise, or control its officers, such as encouraging them to cover their badges or identify themselves to the public. (*Id.* ¶ 469.) This allegedly contributed to the constitutional violations Plaintiffs suffered and means that very few complaints result in any discipline. (*Id.* ¶¶ 470–472.) Officers also often use similar, insufficient boilerplate language to justify their use of force, which the CPD regularly accepts. (*Id.* ¶ 473.) The CPD has failed to comply with Consent Decree provisions aimed to eliminate its code of silence, its draft policy regarding transferring complaints to an Accountability Sergeant does not provide enough detail, and it has not supported an adequate anonymous complaint process. (*Id.* ¶¶ 474–76.)

In February 2021, the CPD issued an after-action report about the summer 2020 protests, which failed to address many of its alleged policy and practice failures but did admit various failures, including lack of preparation, lack of training and compliance with policies regarding mass arrests, and removal of names and badges from officers' uniforms. (*Id.* ¶ 477.) The after-action report did not mention policy violations regarding batons and other uses of force or efforts to protect protesters from harm, among other things. (*Id.* ¶ 478.)

In February 2021, the Inspector General of the City of Chicago issued a report on the City's protest response, which included finding that the CPD failed to train officers regarding mass arrests and failed to provide guidance regarding reporting obligations, Superintendent Brown authorized use of pepper spray in situations involving non-compliant grounds, officers used pepper spray outside of even these limits, officer's use of force was not reviewed, and there were widespread policy violations during the protests. (*Id.* ¶ 479.) These widespread policy

5

violations included, for example, the use of baton strikes and other force and attempts by officers to hide their identities. (*Id.*)

In July 2021, the IMT for the Consent Decree issued a report that similarly described misconduct, including excessive force, and a lack of CPD policies and training to respond to the protests effectively. (*Id.* ¶ 480.) It likewise found that CPD officers were deployed without body-worn cameras and were instructed not to have the cameras on during the protests, and that available body-worn camera footage depicted officers violating the law and CPD policies by excessive force and other means. (*Id.*)

## IV.    Procedural history

Plaintiffs and others originally brought a combined action in this District which was later severed into separate actions, including this one. (ECF No. 1.) Plaintiffs eventually filed their operative amended complaint, alleging fourteen counts against Superintendent Brown, the City, and "Chicago Police Officers in Exhibits A–G." (ECF No. 21.) Plaintiffs' claims include a § 1983 *Monell* claim (Count I), a § 1983 failure-to-intervene claim (Count VII), state-law *respondeat superior* and indemnification claims (Counts XIII and XIV), and various other § 1983 and state-law claims, including purportedly against "all Defendant Officers" and "relevant unidentified Chicago police officers." (*Id.*)

Superintendent Brown and the City filed their pending motion to dismiss (ECF No. 26), which has been fully briefed, and the parties have been conducting discovery in the meantime.

## Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a claim on which relief may be granted. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This standard requires a complaint to contain sufficient "[f]actual allegations" to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court must "construe the complaint in the light most favorable to plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor." *Taha*, 947 F.3d at 469. However, it need not "accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## Discussion

Defendants move to dismiss (1) Plaintiffs' *Monell* claim against the City; (2) Plaintiffs' failure-to-intervene claim as to Superintendent Brown; (3) Plaintiffs' claims against unidentified CPD officers; and (4) Plaintiffs' *respondeat superior* and indemnification claims against the City.

### I. Plaintiffs' *Monell* claim (Count I)

A municipality may not be liable under 42 U.S.C. § 1983 for its police officers' unconstitutional acts on a *respondeat superior* theory but can be liable "when execution of [its]

7

policy or custom . . . inflicts the injury" plaintiffs suffered. *Monell v. Dept's of Social Servs.*, 436 U.S. 658, 694 (1978). To prove a *Monell* claim, a plaintiff must "demonstrate that the [municipality's] official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). A plaintiff also must show that the "policymakers were deliberately indifferent as to the known or obvious consequences" of their policy or custom—meaning that they were "aware of the risk created by the custom or practice and . . . failed to take appropriate steps to protect the plaintiff." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

Plaintiffs pursue two *Monell* theories against the City. First, they allege that the City, through the CPD, Superintendent Brown, and others, "has interrelated *de facto* policies, practices, and customs" that have been implemented in violation of the Constitution and with deliberate indifference to Plaintiffs' rights. (Am. Compl. ¶¶ 484–88.) Second, they allege that Superintendent Brown "was the final policymaker for CPD's response to the protests" and was deliberately indifferent to Plaintiffs' rights in, among other things, maintaining policies, practices, and customs of Chicago Police officers during the protests. (*Id.* ¶¶ 489–94.) The Court addresses each theory in turn.

### a. Widespread practices

Plaintiffs allege that widespread practices at the CPD amounted to *de facto* policies that caused their injuries. A municipality can be liable on such a theory if a widespread practice, "although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (cleaned up). A plaintiff may not rely on an isolated incident, but "[i]f the same

problem has arisen many times and the municipality has acquiesced in the outcome, it is possible . . . to infer that there is a policy at work." *Id.* at 380. A *Monell* claim based on a widespread practice thus "normally require[s] evidence that the identified practice or custom caused multiple injuries." *Chatham v. Davis*, 839 F.3d 679, 687 (7th Cir. 2016). Further, "a municipality's continued adherence to an approach that municipal employees know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1010 (N.D. Ill. 2024) (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 386 (7th Cir. 2017) (Sykes, J., dissenting)).

Plaintiffs have adequately pleaded a *Monell* claim based on alleged widespread practices against protestors that caused their injuries. For example, Plaintiffs allege widespread use of excessive force such as the unjustified use of batons, escalation tactics, a "code of silence" and lack of accountability measures, and lack of training for protest response. They allege how certain protest-response practices have been used at the CPD since 1990, cite multiple reports detailing these practices and similar prior incidents, and quote comments Superintendent Brown allegedly made that corroborate their description of CPD culture. These allegations are enough to plausibly describe CPD practices that are so widespread that they constitute customs and policies with the force of law, which then were then implemented against Plaintiffs during protests in the summer of 2020, as other judges have held in the related *Cosby* and *Reed* cases. *See Cosby*, 711 F. Supp. 3d at 1010–14 (finding that similar allegations "are sufficient to support a claim for *Monell* liability"); *Reed v. Gallegos*, No. 23-CV-002247, 2024 WL 4826495, at *5 (N.D. Ill. Nov. 19, 2024) (same).

9

Defendants claim that the City's efforts to implement the Consent Decree undermine Plaintiffs' *Monell* claim—in their view, the City should be dispositively credited for the progress it has made notwithstanding whatever progress it hasn't made. But a *Monell* claim can be based not only on express policies but also on "an implicit policy or a gap in expressed policies," or on "a series of violations to lay the premise of deliberate indifference." *Thomas*, 604 F.3d at 303 (cleaned up). The City's partial implementation of the Consent Decree may provide some evidence of what policies, practices, and customs were in effect within the CPD in the summer of 2020. But after drawing reasonable inferences in Plaintiffs' favor at this stage, Plaintiffs have adequately alleged that the CPD maintained policies and widespread practices that were not covered by the Consent Decree, contradicted the Consent Decree, or were implemented notwithstanding the City's compliance efforts and were a moving force behind Plaintiffs' injuries. *See Cosby*, 711 F. Supp. 3d at 1012 ("Valuable as it is, the Consent Decree does not defeat a finding that the CPD in fact engaged in other policies or widespread practices in connection with the BLM protests."); *Reed*, 2024 WL 4826495, at *4 ("The Consent Decree and the City's efforts to comply with the Consent Decree do not support an alternative finding."); *Fix v. City of Chicago*, No. 21-cv-2843, 2022 WL 93503 (N.D. Ill. Jan. 10, 2022) ("Because [CPD] officers have continued to use excessive force, even after the City's efforts to remedy the situation, there is a reasonable inference that the City's actions to combat this unlawful conduct have been inadequate."). As in *Cosby* and *Reed*, Plaintiffs here have adequately alleged widespread practices in the CPD's protest response, code of silence, and other areas that amounted to deliberate indifference resulting in their injuries and thus state a *Monell* claim against the City.

b. **Superintendent Brown as final policymaker**

Plaintiffs' separate *Monell* theory against the City based on Superintendent Brown's alleged status as the final policymaker for the CPD's response to the protests fails for the same reasons that theory failed in *Cosby* and *Reed*. Plaintiffs generally allege Superintendent Brown "made all command decisions about the [CPD's] systematic response to protesters during the 2020 uprisings" and "developed and maintained policies, practices, procedures, and customs of Chicago Police officers using excessive force against protesters and falsely arresting protesters." (Am. Compl. ¶¶ 62, 490.) They also allege that Superintendent Brown "encouraged and permitted Chicago police officers to target, attack, and harass protesters," "was physically present for at least one protest," and "made a number of false and misleading statements to the media" about the protests. (*Id.* ¶¶ 62–63.) These allegations are made at too high a level of generality—they do not allege that Superintendent Brown implemented a specific policy that is traceable to Plaintiffs' alleged harm. *See Cosby*, 711 F. Supp. 3d at 1014 (finding these same allegations were merely "bare assertions" under *Iqbal* and did not state a *Monell* theory based on Superintendent Brown as the final policymaker); *Reed*, 2024 WL 4826495, at *5 (finding that these "naked allegations do not rise to the required pleading standard"); *cf. Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) (allowing policymaker theory where the Chicago policy superintendent "was in his headquarters throughout the . . . demonstration, not only monitoring it but also approving the decisions of his subordinates, *specifically their decisions to shield Michigan Avenue from the marchers and to make the mass arrests of the people trapped on Chicago Avenue*" (emphasis added)). Plaintiffs therefore have not stated a *Monell* claim against the City based on Superintendent Brown's alleged role as the final policymaker during the protests.

11

## II. Plaintiffs' failure-to-intervene claim against Superintendent Brown (Count VII)

Plaintiffs' Count VII alleges that Superintendent Brown and other officers failed to intervene to prevent violations of Plaintiffs' constitutional rights. Defendants argue this claim should be dismissed against Superintendent Brown, and the Court agrees.

To prove their failure-to-intervene claim against Superintendent Brown, Plaintiffs must show that Brown "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Liability for such a claim "is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). Courts in this District often "have concluded that police officers who were not present on the scene cannot be held liable for failing to intervene in another officer's unconstitutional acts." *Cosby*, 711 F. Supp. 3d at 1008 (cleaned up) (citing cases). Supervisors still may be liable if they turned a blind eye to specific officers' known misconduct. *See id.*

Here, as in *Cosby* and *Reed* cases, Plaintiffs don't allege that Superintendent Brown knew that the specific officers whose alleged misconduct gave rise to this case were violating Plaintiffs' rights or had a habit of that sort of misconduct. They instead broadly allege that Superintendent Brown was generally aware of widespread practices of CPD officers using excessive force and did not stop those systemic practices but instead encouraged them during the protests. (*See* Am. Compl. ¶ 62.) None of these allegations focus on Superintendent Brown's knowledge or opportunity to intervene on the officer misconduct specifically alleged in this case, as they must. *See Cosby*, 711 F. Supp. 3d at 1009 (finding that similar allegations fail because

12

they "sketch out a theory of liability at the protest-wide level rather than locating liability specifically in Brown's relation with Officer Rodriguez"); *Reed*, 2024 WL 4826495, at *3 ("Plaintiff makes no allegation that Superintendent Brown knew that the Defendant Officers used force against Plaintiff on the date of the incident, that Defendant Officers had a habit of using excessive force against protestors, or that Superintendent Brown knew of this and turned a blind eye to it. Nor did Plaintiff allege that Superintendent Brown had any realistic opportunity to intervene[.]"). Plaintiffs thus have not stated a failure-to-intervene claim against Superintendent Brown.

### III. Plaintiffs' claims against unidentified officers

#### a. The officers depicted in Exhibits B and C

Defendants argue that the claims against the officers depicted in Exhibits B–C of the complaint should be dismissed because Plaintiffs have not identified the officers by name within the limitations period. The Court disagrees.

A court ordinarily will not dismiss a complaint as untimely at the pleading stage because "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP,* 559 F.3d 671, 674 (7th Cir.2009). That said, dismissal may be appropriate if a plaintiff sets forth all elements of a statute of limitations defense and "pleads himself out of court." *Id.* at 674–75. However, "[a]s long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,

13

782 F.3d 922, 928 (7th Cir. 2015). Plaintiffs claim that equitable tolling or other doctrines might apply and overcome a statute-of-limitations defense.

Equitable tolling in this action would be governed by Illinois law. *See Behavioral Inst. of Indiana, LLC v. Hobart City of Common Council,* 406 F.3d 926, 932 (7th Cir. 2005) ("In § 1983 actions tolling of the statute of limitations is governed by the forum state's tolling rules, unless those rules are inconsistent with the purposes underlying 42 U.S.C. § 1983."). Under Illinois law, equitable tolling may apply when a defendant misleads a plaintiff, a plaintiff is faced with "an irredeemable lack of information," or the "the plaintiff could not learn the identity of the proper defendants through the exercise of due diligence." *Richardson v. City of Chicago*, 314 F. Supp. 3d 999, 1010 (N.D. Ill. 2018) (cleaned up) (citing *American Family Mut. Ins. Co. v. Plunkett*, 2014 IL App (1st) 131631, 14 N.E.3d 676, 681).

Here, Plaintiffs' complaint does not foreclose the possibility of equitable tolling. Most notably, Plaintiffs specifically allege that the officer depicted in Exhibit B, like many other officers, "had removed his badge from his uniform," though it is unclear whether the officer depicted in Exhibit C may have done the same. (Am. Compl. ¶¶ 93, 286; *see also id.* ¶ 53 ("CPD officers who violated protesters' constitutional rights also routinely took steps to conceal their identities . . . .").) Ultimately, Plaintiffs' allegations regarding these officers' conduct and other impediments to identifying them plausibly suggest that despite reasonable diligence, Plaintiffs were unable to identify the defendant officers depicted in Exhibits B and C before the limitations period expired. Therefore, the Court will not dismiss Plaintiffs' claims against the unidentified officers depicted in Exhibits B and C on that basis at this time. *Williams v. Nat'l R.R. Passenger Corp.*, No. 22-CV-1112, 2023 WL 6388727, at *3 (N.D. Ill. Sept. 29, 2023) (denying motion to dismiss where a conceivable set of facts could exist supporting equitable tolling); *Burdette-*

*Miller v. Williams & Fudge, Inc.*, No. 18 C 2187, 2019 WL 201886, at *5 (N.D. Ill. Jan. 15, 2019) (same); *Brewer v. City of Chicago*, No. 17 C 4503, 2018 WL 3463281, at *4 (N.D. Ill. July 18, 2018) (same). Still, should Plaintiffs discover who the officers depicted in Exhibits B and C are, they must promptly amend their complaint to benefit from equitable tolling. *See Bryant v. City of Chicago*, 746 F.3d 239, 244 (7th Cir. 2014); *Athmer v. C.E.I. Equip. Co.*, 121 F.3d 294, 297 (7th Cir. 1997).

      b.  **Other officers**

As to any other "Defendant Officers" Plaintiffs' purport to bring claims against, those officers are not properly included as defendants in this case and any claims brought against them are void and dismissed.

In Plaintiffs' amended complaint, they sue (1) Superintendent Brown; (2) the City of Chicago; and (3) "Police Officers in Exhibits A–G." Plaintiffs allege that "Defendants Officers in Exhibits A–G are City of Chicago employees with the CPD" who allegedly "violated Plaintiffs' constitutional rights" and are sued "in their individual capacities." (Compl. ¶ 40.) But while the complaint contains an Exhibit B and an Exhibit C—each of which depicts a defendant officer—none of the other exhibits (A or D–G) exist in the complaint or elsewhere. (*See* Compl. ¶¶ 93, 286.) Plaintiffs do not sue any officers as "John Does," do not otherwise include any other defendants as parties, and have not sought to amend their complaint to add additional officers (named or unnamed) as defendants. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties[.]"); *Myles v. United States*, 416 F.3d 551, 551 (7th Cir. 2005) ("[T]o make someone a party the plaintiff must specify him in the caption and arrange for service of process."). Because there are no defendant officers associated with nonexistent Exhibits A and

15

D–G, or any other defendant officers properly included in Plaintiffs' complaint, the only officers who are proper defendants in this case are those depicted in Exhibits B and C.

Given the Court's ruling and clarification that the only unnamed officers who are proper defendants in this case are those depicted in Exhibits B and C of Plaintiffs' complaint, some of Plaintiffs' claims may no longer be valid because they are not brought against either of those officers, Superintendent Brown, or the City. The parties shall inform the Court accordingly.

## IV. Plaintiffs' *respondeat superior* and indemnification claims (Counts XIII and XIV)

Because the Court does not dismiss Plaintiffs' claims against the officers depicted in Exhibits B and C, it likewise does not dismiss Plaintiffs' *respondeat superior* and indemnification claims that are based on those underlying claims. However, Plaintiffs may not pursue indemnification based on the conduct of officers who are not defendants. *See* 745 ILCS 10/9-102.

The court does not dismiss Plaintiffs' *respondeat superior* claim based on the conduct of non-defendant officers at this time. Plaintiffs allege throughout their complaint that various non-defendant officers committed specific tortious acts, and the doctrine of *respondeat superior* allows the City of Chicago to be held liable even if those officers are not included as defendants or identified with more specificity in the complaint. *See Sanchez v. City of Chicago*, 700 F.3d 919, 926–27 (7th Cir. 2012) ("[U]nder Illinois law, a municipality may be held liable for battery and other wilful and wanton tortious acts committed by its police officers in the course of their duties, even if the plaintiff has not been able to identify those officers."); *Collins v. City of Chicago*, No. 21-cv-02913, 2024 WL 5007836, at *16 (N.D. Ill. Dec. 6, 2024) ("[T]he City can be liable for the conduct of Cerda and the unidentified officer via *respondeat superior* even

16

though the two officers are not defendants in this case."). The Court therefore does not dismiss Count XIII or Count XIV.

## Conclusion

The Court grants in part and denies in part Defendants' motion to dismiss (ECF No. 26). The Court dismisses Count I's *Monell* theory based on Superintendent Brown's alleged actions as a final policymaker but does not dismiss Count I's *Monell* theory based on widespread practices. The Court dismisses Count VII against Superintendent Brown only. The Court does not dismiss Count XIII or Count XIV and does not dismiss Plaintiffs' claims against the officers depicted in Exhibits C and D of their amended complaint. The only defendants in this case are (1) the City of Chicago; (2) Superintendent Brown; (3) the officer depicted in Exhibit B in Plaintiffs' amended complaint; and (4) the officer depicted in Exhibit C in Plaintiffs' amended complaint. Any other purported defendants are dismissed. Within 21 days after entry of this order, the parties shall file a joint status report regarding any other claims that should be formally dismissed based on the Court's ruling regarding the active defendants in this case.

SO ORDERED. ENTERED: March 14, 2025

**HON. JORGE ALONSO**
**United States District Judge**